## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HOP HOP PRODUCTIONS, INC. and<br>FALEENA HOPKINS,<br>                          *Plaintiffs*,<br>    v.<br><br>KEVIN KNEUPPER, TARA CRESCENT, and<br>JENNIFER WATSON,<br>                          *Defendants*. | Civil Action No. 1:18-cv-04670-AKH |

### DEFENDANTS' JOINT MEMORANDUM OF LAW IN
### OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE FOR
### PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Defendants Kevin Kneupper, Tara Crescent and Jennifer Watson, by and through counsel, hereby oppose Plaintiffs' Order to Show Cause for a Preliminary Injunction and Temporary Restraining Order.

# TABLE OF CONTENTS

PAGE

I.      PRELIMINARY STATEMENT ................................................................................. 1

I.      BACKGROUND/STATEMENT OF FACTS ........................................................... 4

    A.      Global Dispute (Cockygate) ......................................................................... 4

    B.      Tara Crescent ................................................................................................. 8

    C.      Kevin Kneupper ............................................................................................. 9

    D.      Jennifer Watson ............................................................................................. 9

II.     ARGUMENT ............................................................................................................ 10

    A.      Plaintiffs Have Not Shown a Clear or Substantial Likelihood of Prevailing on the Merits of Any Claim Asserted .................................................. 10

        1.      Plaintiff's Lanham Act Claim is Barred by Second Circuit Precedent, *Roger v. Grimaldi*. ................................................................................. 11

        2.      The Use of the Word "Cocky" Is Artistically Relevant to the Defendants' Expressive Works. ................................................................ 12

        3.      Nothing About The Defendants' Book Titles at Issue Explicitly Misleads Readers Into Believing The Books Originate From (Or Are Otherwise Associated with) Plaintiffs. .............................................. 14

        4.      Plaintiffs Have Not Shown A Clear or Substantial Likelihood of Prevailing on Its Trademark Infringement/Unfair Competition Claims ............................................ 15

        5.      Plaintiffs Have Not Shown A Substantial Likelihood of Prevailing on Its Declaratory Judgment Claims Against to Mr. Kneupper .................................................. 22

    B.      Plaintiffs Have Not Shown Irreparable Harm ............................................ 23

        1.      Plaintiffs' Delay Precludes a Finding of Irreparable Harm .................. 23

        2.      Plaintiffs Have Failed To Demonstrate Irreparable Harm .................... 25

    C.      The Balance of Hardships Favors Defendants ............................................ 26

    D.      A Preliminary Injunction Limiting Use of the Term COCKY Is Not In the Public Interest ............................................................................................... 27

III.    CONCLUSION ........................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Accord Twin Peaks Prods., Inc. v. Pubs. Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993)............................................................................................ 11

Alzheimer's Foundation of America, Inc. v. Alzheimer's Disease and Related Disorders Ass'n,
  Inc.,
  2015 WL 4033019 (S.D.N.Y. 2015)........................................................................ 10, 11, 18

Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.,
  909 F. Supp. 896 (S.D.N.Y. 1995) ................................................................................... 24

Cheng v. Thea Dispeker,
  35 U.S.P.Q.2d 1493 (S.D.N.Y. 1995).............................................................................. 25

Citibank, N.A. v. Citytrust,
  756 F.2d 273 (2d Cir. 1985)............................................................................................. 23

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*,
  886 F.2d 490 (2d Cir. 1989)............................................................................................. 12

*Clinique Laboratories, Inc. v. Dep Corp*.,
  945 F.Supp. 547 (S.D.N.Y. 1996) ................................................................................... 18

Comic Strip, Inc. v. Fox Television Stations, Inc.,
  710 F. Supp. 976 (S.D.N.Y. 1989) .................................................................................. 24

*Cummings v. Soul Train Holdings LLC*,
  67 F. Supp. 3d 599 (S.D.N.Y. 2014)................................................................................ 12

*DeClemente v. Columbia Pictures Indus.*,
  860 F. Supp. 30 (E.D.N.Y. 1994) .................................................................................... 12

Dillinger, LLC v. Elec. Arts, Inc.,
  No. 09 Civ. 1236, 2011 WL 2457678 (S.D. Ind. June 16, 2011) ............................................ 15

DISH Network, L.L.C. v. ABC, Inc. (In re AutoHop Litig.),
  No. 12 Civ. 4155 (LTS) (KNF), 2013 U.S. Dist. LEXIS 143492, (S.D.N.Y. Sept. 18, 2013). 23

E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,
  547 F.3d 1095 (9th Cir. 2008) .................................................................................. 13, 15

eBay, Inc. v. MercExchange, LLC.,
  547 U.S. 388 (2006)......................................................................................................... 10

Echo Design Group, Inc., v. Zino Davidoff S.A.,
   283 F. Supp. 2d 963 (S.D.N.Y. 2003)........................................................... 11

Gidatex S.R.L. v. Campaniello Imps., Ltd.,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998)........................................................... 24

Greenpoint Fin. Corp. v. The Sperry & Hutchinson Co., Inc.,
   116 F. Supp. 2d 405 (S.D.N.Y. 2000).......................................................... 25

Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,
   523 F.2d 1331 (2d Cir. 1975)..................................................................... 17

*In re Int'l Flavors & Fragrances Inc.*,
   51 USPQ2d 1513 (Fed. Cir. 1999).............................................................. 20

Krueger Int'l, Inc. v. Nightingale Inc.,
   915 F. Supp. 595 (S.D.N.Y. 1996) ............................................................. 25

Louis Vuitton Mallatier, S.A. v. Warner Bros. Entm't Inc.,
   868 F. Supp. 2d 172 (S.D.N.Y. 2012)......................................................... 13

Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.,
   No. 00 Civ. 5746 (RO), 2001 WL 1097865 (S.D.N.Y. 2001)................................. 24

Malletier v. Burlington Coat Factory Warehouse Corp.,
   426 F.3d 532 (2d Cir.2005)....................................................................... 17

Marcy Playground, Inc. v. Capitol Records, Inc.,
   6 F. Supp. 2d 277 (S.D.N.Y. 1998) ............................................................ 24

*Mattel, Inc. v. MCA Records*,
   296 F.3d 894 (9th Cir. 2002) ........................................................... 12, 13, 15

Mazurek v. Armstrong,
   520 U.S. 968 (1997)................................................................................ 10

*Mobileye, Inc. v. Picitup Corp.*,
   No. 12 Civ. 1994(JSR), 928 F.Supp.2d 759, 2013 WL 830837 (S.D.N.Y. Mar. 5, 2013)....... 18

National Football League Players Ass'n v. Nat'l Football League Props., Inc.,
   1991 WL 79325 (S.D.N.Y. 1991)................................................................ 25

New Look Party Ltd. v. Louise Paris Ltd.,
   No. 11 Civ. 6433 (NRB), 2012 WL 251976 (S.D.N.Y. Jan. 11, 2012)..................... 25

New York City Triathlon LLC v. NYC Triathlon Club, Inc.,
   704 F.Supp.2d 305 (S.D.N.Y. 2010)........................................................... 10

*Opticians Assoc. v. Independent Opticians*,
   734 F.Supp. 1171 (D.N.J.) ............................................................................ 22, 23

Origins Nat'l Res., Inc. v. Kotler, 2001 WL 492429 (S.D.N.Y. 2001) ........................................ 25

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
   86 F.Supp.2d 305 (S.D.N.Y. 2000) ............................................................ 18

*Parks v. LaFace Records*,
   329 F.3d 437 (6th Cir. 2003) ...................................................................... 12

REDF Organic Recovery, LLC v. Kafin,
   No. 12 Civ. 7973 (JFK), 2012 WL 5844191 (S.D.N.Y. Nov. 19, 2012) ................................ 25

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) .......................................................... passim

Salinger v. Colting,
   607 F.3d 68 (2d Cir. 2010) ........................................................................ 10

San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,
   565 F.2d 683 (C.C.P.A. 1977) .................................................................... 18

*Seale v. Gramercy Pictures*,
   949 F. Supp. at 340 (E.D. Pa. 1996) .......................................................... 15

Sunward Elecs., Inc. v. McDonald,
   362 F.3d 17 (2d Cir. 2004) .................................................................. 10, 11

Tom Doherty Assocs., Inc. v. Saban Entm't Inc.,
   60 F.3d 27 (2d Cir. 1995) .......................................................................... 25

Total Control Apparel v. DMD Int'l Imps., LLC,
   409 F. Supp. 2d 403 (S.D.N.Y. 2006) ........................................................ 24

Tough Traveler, Ltd. v. Outbound Prods.,
   60 F.3d 964 (2d Cir. 1995) ........................................................................ 23

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
   875 F.3d 1192 (9th Cir. 2017) .............................................................. 12, 13

Universal City Studios, Inc. v. Nintendo Co., Ltd.,
   746 F.2d 112 (2d Cir. 1984) ...................................................................... 18

*University of Ala. Bd. of Trs. v. New Life Art, Inc*,
   683 F.3d 1266 (11th Cir. 2012) ................................................................ 12

Winter v. Nat. Res. Def. Council, Inc.,
   555 U.S. 7 (2008) ...................................................................................... 25

**<u>Rules</u>**

TBMP § 510.02............................................................................................................... 22

## I.     **PRELIMINARY STATEMENT**

Plaintiffs' request for a preliminary injunction censoring the continued publication of various artistic works is unwarranted and unsupported.  Plaintiffs cannot establish a likelihood of success on the merits because they lack any valid rights in and to the term *cocky* as a trademark. On the merits, the term *cocky* is simply incapable of operating as a single-source identifier in the field of romance novels.[1]  Well before Plaintiffs' began to claim the word "cocky" as their own, countless romance novels employed "cocky" (*i.e.,* a synonym for *arrogant*, *bold*, *brash*, *confident*, *smug*, *self-assured,* and *shameless,* among other adjectives) in their titles and elsewhere to describe romance hero archetypes.  The notion that Plaintiffs, who allegedly only commenced use of "cocky" in 2016, could somehow monopolize that word is ridiculous.

In fact, cockiness (in all its permutations) remains as prevalent in romance novels as the use of stunning, scantily-clad models on their covers.  As such, consumers are well-accustomed to distinguishing one romance novel from another based on indicia of origin *other* than stock character traits like "beautiful," "passionate," or "cocky"; in particular, readers rely on the *sine qua non* of novel source-identification: the name of the author.  Against this background, "cocky" could not possibly function as a signifier of a *single* source in this genre.  Moreover, even assuming *arguendo* that the law affords Plaintiffs rights in *cocky* as claimed, under the law of this Circuit as established in *Rogers*, a mere likelihood of confusion is not a sufficient basis upon which to censor a defendant's artistic expression.  To stifle Defendants' art, Plaintiffs would need to establish the Defendants' works explicitly mislead consumers.  Plainly, they cannot.

---

[1] Defendants note, too, that those facts available at this early date and in the absence of discovery also cast doubt on the extent to which Plaintiffs have ever made true trademark use of the term.

Beyond the obvious issues with the merits, it is evident from the face of the complaint that Plaintiffs failed to conduct a reasonable pre-filing investigation before racing to the courthouse.  Indeed, the number and extent of defects alone call into question whether the filing was made in good faith.  Plaintiffs' lack of due diligence failed to uncover the stark difference between a *publisher* and a *publicist*, *i.e.,* non-party best-selling author Penny Reid is the former, while Defendant Jennifer Watson is the latter (Ms. Watson's website even states that she provides "publicist and marketing services" and nowhere indicates that she writes or publishes books).

Indeed, contrary to Plaintiffs' unsupported allegations that Ms. Watson "played a key role in a juggernaut attack on [Plaintiffs'] trademarks, books and person (*Dkt*. 6 at 2), Ms. Watson played no role whatsoever in the conception, creation, authorship, decision to publish, or publication of *The Cocktales Anthology*,[2] and otherwise lacks any authority to halt or impact its publication.  In reality, Ms. Watson simply did what publicists do: promoted and marketed *The Cocktales Anthology* pre-publication at the request of its authors, including Penny Reid and the many other contributors to anthology (and did so *gratis*).[3]   In short, Plaintiffs pre-filing investigation led them to sue the wrong party and seek extraordinary relief from someone who, even if ordered to do so, could not comply with Plaintiffs' extreme demands.

Plaintiffs' lack of diligence also notably resulted in a failure to identify a Canadian resident named Tara Crescent in favor of identifying a Canadian street by that same name. *See Dkt*. 1 at Exh., C (a Google Map Printout of a Toronto Suburb).  Plaintiffs' papers make no discernible connection of the street to the author of books entitled *Her Cocky Doctors* and *Her*

---

[2] The publication title for *The Cocktales Anthology* is "Cocktales: The Cockiest Anthology."
[3] Contrary to Plaintiff's claim, Plaintiffs have not served Ms. Watson with its Motion or the Court's Order via overnight mail.  Ms. Watson does not live or work in Houston, Texas, and has no association whatsoever with the Houston address Plaintiffs' allegedly served.

*Cocky Firefighters*, Plaintiffs failure is especially perplexing given their significant delay in bringing this action against Ms. Crescent.  Indeed, Plaintiffs seek to enjoin Ms. Crescent from further sale of books that have spent at least six months in the stream of commerce without demonstrating a pressing need to do so now.

Finally, Plaintiffs have sued a California resident, Kevin Kneupper, Esq., in New York over a Petition to Cancel Plaintiffs' Registered Trademarks that Mr. Kneupper electronically filed with the Trademark Trial and Appeal Board (TTAB) of the U.S. Patent & Trademark Office (USPTO) in Alexandria, Virginia.  No connection to New York is alleged, nor is Mr. Kneupper accused of infringing any trademark rights owned or controlled by Plaintiffs.  Instead, Mr. Kneupper has been added to this action solely as part of a declaratory judgment claim whereby Plaintiffs (*i.e.,* the alleged trademark owners) seek a declaration from this Court that "the use of [Plaintiffs'] Federally Registered Trademarks do not infringe upon any existing and valid of rights of Defendants."  *Dkt*. 1 at 95.

Notably, the only commonality that Mr. Kneupper shares with his co-defendants is a total disavowal of any legal or proprietary rights to the term *cocky.*  In other words, Plaintiffs seek a declaration from this Court that their claimed rights do not infringe upon rights *that none of the Defendants have ever claimed to possess* (*i.e.,* "rights" that only exist in the public domain).  The merit of such a request speaks for itself.  As such, it is respectfully submitted that Mr. Kneupper was sued in New York purely as retaliation for filing the Petition to Cancel Plaintiffs' registrations. Indeed, while it is certainly within this Court's subject-matter jurisdiction to adjudicate issues of whether the actions of Watson and Crescent constitute infringement of a valid U.S. trademark, Plaintiffs cite no authority whereby this Court's inherent powers to control its own docket also transcend the separation of powers, extending to the dockets of other tribunals sitting in other branches of the U.S. government.

{10620/609817-000/01960501.1}

3

In sum, there is nothing meritorious about Plaintiffs' situation, let alone urgent or irreparable.  Defendant Watson cannot offer Plaintiffs the relief they seek as she bears no responsibility for *The Cocktales Anthology* they wish to enjoin from further publication. Defendant Crescent's first allegedly infringing book was published over nine months ago. Plaintiffs have admitted that her use of "cocky" in titles would not likely cause confusion as to source or affiliation; moreover, she has publicly stated that she has not suffered lost sales. Defendant Kneupper's Petition for Cancellation was filed on May 7, 201 and, if Plaintiffs believe it they are entitled to any specific relief in that action (*e.g.,* a dismissal or stay), nothing is preventing them from making an application directly to the Trademark Trial and Appeal Board.

Respectfully, this Court should decline Plaintiffs' demands for court-ordered censorship by endorsing the freedom of artists to title their books as a form of artistic expression.  Many of the alleged hardships alleged by Plaintiffs stem not from the activities they wish to enjoin, but from the valid reaction from the writing community's worst fear—that a single author could monopolize a word or character trait as common as "cocky."  Any order that restricts creative expression in favor of promoting the tenuous (at best) purported rights of a single author is simply contrary to the public interest in freedom of expression.   No one should hold a monopoly on cocky.

## I.    BACKGROUND/STATEMENT OF FACTS

### A.    Global Dispute (Cockygate)

Hopkins' book entitled *Cocky Roomie: A Bad Boy Romance Novel (The Cocker Brothers of Georgia) (Volume 1)* was published on or about June 15, 2016. (Emerson Decl. ¶ 3, Ex. A.) Thereafter, Hopkins published additional books that contain the term *cocky* in the title; in each, the adjective *cocky* was combined with additional matter, *e.g., Cocky Cowboy*, *Cocky Biker*, *Cocky Senator*, and so forth.  (Emerson Decl. ¶ 4, Ex. B).   As shown, for example, in the book

jackets submitted as specimens of use in support of Plaintiffs' trademark applications discussed herein, the titles within this series identify and describe each book's protagonist. (Complaint at Exhs. E; G.)   Hopkins consistently identified and promoted the series as *The Cocker Brothers* or *The Cocker Brothers of Atlanta*. (Crescent Decl. ¶¶ 12-14).  The specimens of use submitted to the USPTO likewise show use of "Cocker Brothers" on the book covers in addition to the titles. (Complaint at Exhs. E; G).

At some point in time, Hopkins began to tag her e-books on Amazon as follows: *Cocker Brothers, The Cocky Series Book [#]*. (Emerson Decl. ¶ 5, Ex. C.)  Notably, the covers for these books bear the series title *Cocker Brothers*, but do <u>not</u> reference "The Cocky Series." *See id*. On or about <u>April 8, 2018</u>, *i.e.,* less than two months ago, Hopkins changed her series name on GoodReads to "The Cocky Series." (Crescent Decl. Ex. 18).

Hopkins was not the first romance author to make use of the adjective *cocky* in connection with romance novels, either as part of a title or a series name.  Indeed, she chose to enter a somewhat crowded field.  For instance, author Lane Hart released the first of a nine book romance series named *Cocky Cage Fighter* on or about August 15, 2015. (Emerson Decl. ¶ 6, Ex. D; Crescent Decl. ¶ 6).  By the time Hopkins published her first *Cocker Brothers* book, there were at least four *Cocky Cage Fighter* books in circulation.  Moreover, by the time Ms. Hopkins filed her application to register *cocky* as her trademark, all nine *Cocky Cage Fighter* books had been released.  *See id*.

Of special note and relevance to this case, Penelope Ward and Vi Keeland's bestselling book *Cocky Bastard* was released on or about August 15, 2015.  It was so well-received that it made the New York Times Best Sellers lists. (Emerson Decl. ¶¶ 7-8, Ex. E and F; Crescent Decl. ¶ 5).  This book preceded Hopkins first publication of a *cocky*-titled book by almost a year. Other notable titles pre-dating Hopkins in the genre (but by no means an exhaustive list) include:

- *Bite Me, Cocky* by Lucee Joie, published *circa* May 8, 2012;

- *A Little Bit Cocky* by Vee Michael, published *circa* January 30, 2011;

- *The Cocky Cowboy* by Suzanne Crawford, published *circa* January 18, 2013;

- *Cocky Ballsboa: An Erotic Parody* by K. Dianysus, published *circa* March 11, 2014;

- *Cocky Cowboys* by J.T. Riggs published *circa* December 13, 2014;

- *Cocky Swaps* by Heather White, published *circa* October 27, 2014;

- *Cocky: A Stepbrother Romance* by Emma Johnson published *circa* July 14, 2015;

- *Cocky: A Cowboy Stepbrother Romance by Kaylee Kazarian*, published *circa* August 12, 2015;

- *Cocky: A Stepbrother Romance* by Mia Carson, published *circa* August 17, 2015;

- *Cocky Stepbrother: A Billionaire Romance by Emily Guzman*, published *circa* November 23, 2015;

- *The Cocky Country Boy* by Edward Raines, published *circa* November 23, 2015;

- *A Cocky Werewolf* by Wolfgang Glasscock, published *circa* December 8, 2015;

- *Cocky Prince* by Jules Barnard, published *circa* March 28, 2016; and

- *Her Cocky Gangster: A Bad Boy Contemporary Romance by Brenna Ryan* published *circa* June 14, 2016.

(Emerson Decl. ¶ 9, Ex. G; Crescent Decl. ¶¶ 5-6.)

In September of 2017, Hopkins' company Hop Hop Productions, Inc. filed two applications with the USPTO.  (Complaint at Exhs. E, G).  These filings included Application Serial No. 87604348 to register the word mark COCKY in connection with a series of downloadable e-books in the field of romance, and a series of books in the field of romance.  (Complaint Ex. E).  That application claimed a purported date of first use of June 16, 2016, indicating that Hop Hop Productions based its claim of rights on the mere appearance of the term

COCKY within the titles of Hopkins' books. *See id.*  Notably, in filing that application, Plaintiff Hop Hop Productions, Inc.'s attorney, Jonathan Pollack, declared, *inter alia*, that

> "To the best of signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

*See id.*  This application matured to registration on April 17, 2018. (Complaint at Ex. F).

Hop Hop Productions also filed Application Serial No. 87604348 to register COCKY (Stylized) in connection with the same goods based on a purported use of that mark in commerce of June 5, 2017. (Complaint Ex. G). Applicant's attorney signed the same declaration noted above. *See id.*  This application matured to registration on May 1, 2018. (Complaint Ex. H). On information and belief, Hop Hop Productions may have filed this application in violation of its license agreement with Set Sail Studios, the entity that developed the font shown in the applied-for mark. (Emerson Decl ¶ 10, Ex. H).  That is, the license agreement does not, *inter alia*, permit licensees to register marks in the licensor's proprietary fonts.

Upon the issuance of these registrations, Hopkins apparently sent cease and desist letters to other authors around the country whose titles contained the term *cocky*, claiming that if they did not change their titles, she would be entitled to "win all the monies" earned on those books, plus attorneys' fees.  (Emerson Decl. ¶ 11, Ex. I).  Such claims made to fledgling and well-published authors alike, made under color of authority of the U.S. trademark registration numbers and accompanying certificates, scared several unwitting authors to capitulate to Ms. Hopkin's demands out of fear of the tremendous cost of having to obtain legal counsel. Apparently not satisfied with the results of that campaign, Hopkins then approached online retailers to have her competitors' titles pulled from the shelves, costing them sales, reviews, and rankings.  (*See, e.g.*, Crescent Decl . ¶ 11).

Both (i) the issuance of these registrations (which cover a single term that is stock if not ubiquitous within the lexicon of romance and erotica novels) and (ii) Hopkins' aggressive attempts to enforce her purported rights, created a tremendous amount of concern and anxiety within the romance community, specifically, and the writing community as a whole. (Emerson Decl. ¶ J, Exhs. I; J; Reid Decl. ¶¶ 3-4.). The resulting community discussion of this global dispute in social media circles spawned an umbrella term that generally refers to the dispute: *#cockygate*.

### B.      Tara Crescent

Defendant Tara Crescent is a professional author of romance novels, who has published 45 books to date. *See* Crescent Decl. ¶ 3.  Crescent has been writing professionally for nearly 5 years and have sold the equivalent of over 300,000 copies of my works in that time. *Id.* Crescent has been using the term "cocky" in her novel titles since August of 2017. *Id.* ¶ 4.  The first novel in her series of "cocky" novels, entitled, "Her Cocky Doctors," was released on August 22, 2017, and the next, entitled "Her Cocky Fighters," was released on November 12, 2017. *Id.* ¶ 4 & Ex. A.

Crescent is not the first author to use the term "cocky" in the title of a romance novel. *Id.* ¶ 5.  Indeed, by virtue of her writing career, Crescent is aware that the term *cocky* has been commonly used in the title of romance novels since at least as early as 2012, including, by way of example, titles such as *Bite Me, Cocky* (released May 8, 2012) and *Cocky Cowboys* (released December 13, 2014). *See id.* ¶ 5 & Ex. B (identifying six romance novels written by third parties which use the term *cocky* in the title).  The term is also used in an existing series of eleven romance novels, all using the phrase *Cocky Cage Fighter* in the title. *Id.* ¶ 6 & Ex. C.

Plaintiff Hopkins is aware of the ubiquitous use of the word *cocky* in romance novel titles.  When Hopkins contacted Crescent regarding her use of the word *cocky* on August 18,

2017, Crescent specifically mentioned that the use of the word *cocky* on a romance novel cover is not unique and has been used by romance writers long before she began using it. *Id.* ¶¶ 8-9. Hopkins did not disagree (*id.* ¶ 8), and in fact admitted that readers "won't think that [Hopkins] wrote" Crescent's books, despite the use of the word *cocky* in the titles. *Id.* ¶ 10. Hopkins did not appear concerned about confusion at that time (*id.* ¶¶ 8-11), and in the nine months since, nobody has expressed to Crescent that they thought her books were written by Hopkins or otherwise connected to Hopkins, or that Hopkins' books were written by Crescent or otherwise connected to Crescent. *Id.* ¶ 20.

### C.    Kevin Kneupper

Defendant Kevin Kneupper is an attorney and author.  On May 7, 2018, he filed a Petition to Cancel Hop Hop Productions' registrations for COCKY and COCKY (Stylized) before the Trademark Trial and Appeal Board based on multiple grounds including fraud on the USPTO and descriptiveness. (Complaint Ex. A.)    To date, Hop Hop Productions has not participated in that proceeding.  ((Emerson Decl. ¶ 13, Ex. K).

### D.    Jennifer Watson

Defendant Jennifer Watson is a book publicist for several independent authors, including Penny Reid. (Watson Decl ¶ 2; Reid Decl. ¶ 4).  On or about May 9, 2018, Reid asked Watson to assist her in publicizing an anthology of works by entitled COCKTALES that was being written by Reid and several other authors. (Watson Decl. ¶3; Reid Decl. ¶ 4).  Watson agreed to do so as a favor to Reid and was not compensated. (Watson Decl. ¶ 2; Reid Decl. ¶ 5).  Ms. Watson was not the "orchestrator" behind this Anthology. She, in fact, has nothing to do with the conception, creation, authorship, decision to publish, or publication of this Anthology.  (Watson Decl. ¶ 4; Reid Decl. ¶ 6).  To this day, other than her small role as a publicist, she has no involvement with its publication and distribution.

## II.   ARGUMENT

Preliminary injunctions are "extraordinary and drastic remed[ies] that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  A party seeking a preliminary injunction must establish, in addition to a showing of likelihood of success on the merits, that (1) "he is likely to suffer irreparable injury in the absence of an injunction;" (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury;" (3) the balance of hardships tips in his favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay, Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006)); *see also New York City Triathlon LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 328 (S.D.N.Y. 2010) (applying *eBay* standard to trademark case). When a party is seeking a preliminary injunction that will alter, rather than maintain, the *status quo*, it is required to show "a clear or substantial likelihood of success," *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004). Presumably, the standards by which Rule 65 can be applied to this case are well-known to the Court.  Accordingly, Defendants will limit the following analyses to the operative issues and material points of contention.

### A.   Plaintiffs Have Not Shown a Clear or Substantial Likelihood of Prevailing on the Merits of Any Claim Asserted

As Plaintiffs correctly note, in order to succeed on its federal trademark claim, it must show that Defendants' use of the mark is likely to cause confusion as to the origin or sponsorship of the products at issue (*i.e.,* books). *Alzheimer's Foundation of America, Inc. v. Alzheimer's Disease and Related Disorders Ass'n, Inc.,* 2015 WL 4033019, at *3-4 (S.D.N.Y. 2015) *Alzheimer's Found.*, 2015 WL 4033019, at *3-4.  For its New York unfair competition claim, it must also show a likelihood of confusion, as well as bad faith.  *Echo Design Group, Inc., v. Zino*

*Davidoff S.A.,* 283 F. Supp. 2d 963, 967 (S.D.N.Y. 2003).   However, Plaintiff misstates the showing it must make.   Because it seeks an injunction that would change the *status quo* rather than preserve it (by forcing authors to change the name of their books), it must show "a clear or substantial likelihood of success." *Alzheimer's Found*., 2015 WL 4033019, at *4-5 (quoting Sunward Elecs., 362 F.3d at 24).   This is a high bar to meet – higher than the showing under the traditional preliminary injunction standard.   *Id*. at *11 (holding insufficient showing for mandatory preliminary injunction even though "most [*Polaroid*] factors are either neutral or weigh in [Plaintiff]'s favor," and even though "[Plaintiff]'s case is persuasive, and there is a real possibility that it will prevail on its claims.").

### 1.     Plaintiff's Lanham Act Claim is Barred by Second Circuit Precedent, *Roger v. Grimaldi*.

As an initial matter, Plaintiffs' claim of trademark infringement is foreclosed by the two-prong test set forth in the Second Circuit's seminal decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).   Recognizing the strong First Amendment protections afforded to creators of expressive works, *Rogers* holds that the use of a trademark in the title of an expressive work does not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or if it has artistic relevance, unless the title explicitly misleads as to the source or content of the work."   *Rogers*, 875 F.2d at 997-1000.   *Accord Twin Peaks Prods., Inc. v. Pubs. Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).

Indeed, as a threshold matter, the *Rogers* test is unquestionably applicable to the use of a trademark in the title of a book, which is an archetypal example of First Amendment-protected work. *See Rogers*, 875 F.2d at 997 (noting "[m]ovies, plays, books, and songs are all indisputably works of artistic expression").   While the *Rogers* case itself involved the use of celebrities' names in the title of a motion picture, the Second Circuit (and every other Circuit to

adopt the *Rogers* test[4]) has made clear that the Rogers inquiry applies to all categories of claims under the Lanham Act brought against expressive works, whether involving names or trademarks, and without distinction as to the specific kind of work.  *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (explaining that "the Rogers balancing approach is generally applicable to Lanham Act claims against works of artistic expression").  *See, e.g.*, *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196-98 (9th Cir. 2017) (affirming application of *Rogers* to dismiss Lanham Act claim involving use of record label's trademark in title of television series); *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 606 (S.D.N.Y. 2014) (applying *Rogers* to dismiss Lanham Act claim against DVD sets of television series); *DeClemente v. Columbia Pictures Indus.*, 860 F. Supp. 30, 35-36 (E.D.N.Y. 1994) (applying Rogers to dismiss Lanham Act claim brought by allegedly original "Karate Kid" against film series titled "The Karate Kid").

2.      **The Use of the Word "Cocky" Is Artistically Relevant to the Defendants' Expressive Works.**

Applying the first prong of the *Rogers* test, there is no question that the use of the adjective *cocky* is artistically relevant to the underlying content of Crescent's romance novels and therefore should not be foreclosed by a Lanham Act claim.  No one person should be able to claim a monopoly on such a commonly used word for book titles in a genre; to do so here would

---

[4] *See, e.g., Mattel, Inc. v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) ("We agree with the Second Circuit's analysis and adopt the Rogers standard as our own."); *Parks v. LaFace Records*, 329 F.3d 437, 451-52 (6th Cir. 2003) ("Rogers is the best test for balancing Defendants' and the public's interest in free expression under the First Amendment against [Plaintiff's] and the public's interest in enforcement of the Lanham Act."); *University of Ala. Bd. of Trs. v. New Life Art, Inc*, 683 F.3d 1266, 1278 (11th Cir. 2012) (adopting Rogers and explaining that "we have no hesitation in joining our sister circuits by holding that we should construe the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark").

be like an author claiming trademark rights in the word *death* as a series title for murder mysteries and suing anyone who used that word in the title of their crime stories.

"The threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has no artistic relevance to the underlying work *whatsoever*.'" *Louis Vuitton Mallatier, S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (emphasis in original) (quoting *Rogers*, 875 F.2d at 999). As the Ninth Circuit recently explained, "the level of [artistic] relevance must merely be above zero." *Twentieth Century Fox Television*, 875 F.3d at 1198 (quoting *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,* 547 F.3d 1095, 1100 (9th Cir. 2008)). For example, a title may have artistic relevance by linking the word to another work, *see, e.g.*, *Mattel*, 296 F.3d 894 (MCA's use of Mattel's *Barbie* mark held artistically relevant to the "Barbie Girl" song), or it may have artistic relevance by supporting the themes and geographic setting of the work, *see, e.g. Twentieth Century Fox*, 875 F.3d at 1198-99 (Fox's use of Empire Distribution's *Empire* mark held artistically relevant to the "Empire" show, given the show's setting in New York, the Empire State).

Based on these minimal standards, Crescent's use of the word *cocky* – a word commonly used in romance novels – indisputably is "artistically relevant" to the underlying Book. Cocky is a commonly used term in the titles of romance novels, in part because of its double entendre as a sexual innuendo that references part of the male anatomy and a synonym for being arrogant or a "bad boy" – both of which are relevant themes in these types of stories. (Crescent Decl. ¶ 7). Accordingly, the relevance of the word "cocky" to the expressive works here is sufficient to satisfy the first prong of the *Rogers* test.

*Cocktales*, too, exceeds the low threshold of artistic relevance, as does the use of "the Cocky Collective" to refer to the forty author-contributors and the wording "authors who take cockiness to a whole new level" on the cover. As an initial matter, many of the stories including

in the anthology feature a "cocky" or arrogant protagonist.  Significantly, as the anthology is responsive to the issuance of Plaintiffs' registration and subsequent efforts to enforce those marks and the tremendous response of the writing community in protest—a confluence of events and ideas that has been commonly known as #cockygate.  The term is used throughout the stories—occasionally in reference to chickens and roosters (and on its cover) to parody Plaintiffs' attempt to monopolize the word "cocky" and scare authors away from using it in book titles and elsewhere.  Indeed, in addition to the stories, the book includes a forward by author Nana Malone who describes, without naming names, how Plaintiffs' enforcement of her purported COCKY marks impacted her personally. *See id*.  Just as Barbie Girl is a song about the values Danish musical artists Aqua associated with Barbie dolls, see *Mattel*, 296 F.3d at 902, *Cocktales* is an artistic commentary by the anthology contributors on #cockygate.

### 3.  Nothing About The Defendants' Book Titles at Issue Explicitly Misleads Readers Into Believing The Books Originate From (Or Are Otherwise Associated with) Plaintiffs.

The second prong of the *Rogers* test examines whether the title gives an "explicit indication," "overt claim," or "explicit misstatement" as to the source or content of a defendant's work. *See Rogers,* 875 F.2d at 1001.  In this case, there is nothing "expressly misleading" about the title of Crescent's books or *Cocktales*.  Neither the books nor their covers contain any suggestion, much less an explicit indication, that Plaintiffs have endorsed the books or had a role in writing or publishing them.  Indeed, there is not a single reference to Plaintiffs in the books, which instead clearly and explicitly identify to readers that they are reading a book written by Crescent or a collective of authors, respectively.  There would be no more reason to associate the books with Plaintiffs' books than any of the numerous other romance books that also include the word *cocky* in their titles.  (Emerson Decl. ¶¶ 6-9 Exhs. D-G; Crescent Decl. ¶¶ 5-6_ This is

particularly true of COCKTALES, which bears a giant Rooster on its cover—a far cry from a bare-chested man.

Numerous courts have held that the absence of any indicia of endorsement is alone sufficient to satisfy the second prong of the *Rogers* test. *See, e.g., Rogers, 875 F.2d at 999; Mattel*, 269 F.3d at 902 (song title "Barbie Girl" did not "explicitly or otherwise" suggest that it was produced by plaintiff); Seale v. Gramercy Pictures, 949 F. Supp. at 340 (E.D. Pa. 1996) (use of plaintiff's name in connection with promotional packaging on works made "no explicit suggestion" that plaintiff endorsed, sponsored or approved the works). And here, to the contrary of affirmative statements that expressly mislead, there are specific indicia on the book cover which contradict any inference of sponsorship or endorsement.

Further, the use of the word *cocky* alone, even if Plaintiffs owned exclusive rights over that word (they do not), does not make the use "explicitly misleading," as *Rogers* requires. *See, e.g., Mattel*, 296 F.3d at 902 ("if [the use of plaintiff's mark] were enough to satisfy this [second] prong of the *Rogers* test, it would render *Rogers* a nullity"); *E.S.S. Entm't*, 547 F.3d at 1100 ("the mere use of a trademark alone cannot suffice to make such use explicitly misleading"); *Dillinger, LLC v. Elec. Arts, Inc.*, No. 09 Civ. 1236, 2011 WL 2457678, at *18 (S.D. Ind. June 16, 2011) ("To be 'explicitly misleading,' the defendant's work must [go] beyond the mere use of plaintiff's name or other characteristic.") (citing *Rogers*, 875 F.2d at 1001).

Given the lack of any affirmative misrepresentation in Crescent's works or *Cocktales* that Plaintiffs somehow are affiliated therewith, Plaintiff cannot satisfy *Rogers'* second prong.

> **4.      Plaintiffs Have Not Shown A Clear or Substantial Likelihood of Prevailing on Its Trademark Infringement/Unfair Competition Claims**

Even assuming *arguendo* that *Rogers* does not bar Plaintiffs' claims here, Plaintiffs fail to reasonably analyze the merits of this case pursuant the *Polaroid* factors factor despite a need for

Plaintiffs' to demonstrate a "clear or substantial" likelihood of confusion.  Instead, Plaintiffs curiously cite Ninth Circuit precedent (which applies that Circuit's *Sleekcraft* factors, which differ from *Polaroid*) in support of a contention that a plaintiff needs not prevail on all or even a majority of factors to ultimately succeed on the merits.  *See* Plaintiffs' Moving Papers at 13.  Such contention is of little use when Plaintiffs' give short shrift to the otherwise dispositive *Polaroid* factors.

For instance, in terms of the first Polaroid factor (strength of Plaintiffs' mark), courts measure a mark's "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996).  When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce. *Streetwise Maps, Inc. v. VanDam, Inc*., 159 F.3d 739, 743–44 (2d Cir. 1998). A trademark or dress is generally classified on a spectrum of increasing distinctiveness as (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).  A mark is generic if it refers merely to "the genus of which the particular product is a species." *Id*. A descriptive mark describes the nature of the product.  A suggestive mark uses names in a creative way to suggest the nature of the product and generally requires purchasers to use "imagination, thought and perception to reach a conclusion as to the nature of the goods." *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir. 1985).  Fanciful or arbitrary marks are those invented solely for trademark usage. They are marks that do not describe or suggest the nature or qualities of the product and are given the greatest protection. *See, e.g., Exxon Corp. v. Xoil Energy Resources, Inc*., 552 F.Supp. 1008, 1014 (S.D.N.Y. 1981) (holding that "Exxon" is an arbitrary trademark). Here, incredibly,

Plaintiffs contend that *cocky* when used in the context of a series of *romance* novels about the "Cocker Brothers," a pride of "alpha male" protagonists whose individual story lines differ only by a second character descriptive used in conjunction with each title (*e.g.,* Cocky Romantic, Cocky Biker, Cocky Cowboy, *etc.*) is arbitrary. As romance novels frequently involve 'alpha males' as their protagonists – and Plaintiffs routinely describes in the titles to her works adjectives that further connote some characteristic of that book's protagonist – it is difficult to fathom how Plaintiffs can contend in good faith that *cocky* is "arbitrary" here in the same context that *Apple* is arbitrary for computers.   Plaintiffs' claim of rights in *cocky* is far more akin to asserting rights in Apple for apple juice.  No proffer whatsoever is made by Plaintiffs to carry their heavy burden here, which is unsurprising given that Defendants can (and have, *supra*) identified more than a dozen examples of romance authors not named Faleena Hopkins who beat Ms. Hopkins to the marker with *cocky*-titled books.  Instead, Plaintiffs simply conclude, *sans* evidentiary support, that their marks are arbitrary and, as a result are (i) inherently distinctive and (ii) have acquired secondary meaning.  *See* Plaintiffs' Moving Papers at 18.  Respectfully, the Court should disagree.

Plaintiffs' analysis of the second *Polaroid* factor fares no better.  Oddly, Plaintiffs (correctly) citing the appropriate legal standards, *i.e.,* that similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances,[5] and further that "[s]ide by side comparison is not the appropriate test," but rather "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would

---

[5] *See Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir.2005); *see also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir. 1975) ("The examination of the similarity of the trademarks, however, does not end with a visual comparison of the marks. Trademarks, like small children, are not only seen but heard.").

likely be confused when presented with defendant's mark alone." *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 552 (S.D.N.Y. 1996).  *See* Plaintiffs' Moving Papers at 20.  But thereafter immediately fail to apply those standards, instead do the opposite by expressly contending that "in this matter, ***taking the marks side by side***, we find that they are all substantially similar […]." *Id.* at 21.  Properly analyzed, the total commercial impression of the *COCKTALES*, *Her Cocky Doctors*, and *Her Cocky Firefighters,* each and all, differ substantially from Plaintiffs' *Cocker Brothers, The Cocky Series Book* and claimed registration rights. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 117 (2d Cir. 1984) ("In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar."); *see also San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.*, 565 F.2d 683, 685 (C.C.P.A. 1977) ("Each syllable of each mark generates an 'impact,' but the only impact to be considered is that of the whole."). In any event, having cited the right standard but applied the wrong one, Plaintiffs have waived any right to meet their burden on this *Polaroid* factor going forward.

The third and fourth *Polaroid* factors address the competitive proximity of the products and the possibility of the senior user "bringing the gap" and entering the junior user's market. Alzheimer's Found., 2015 WL 4033019, at *8. Put another way, these two factors "focus on the degree to which the products currently compete with each other or are likely to compete with each other in the future." *Mobileye, Inc. v. Picitup Corp.*, No. 12 Civ. 1994(JSR), 928 F.Supp.2d 759, 780, 2013 WL 830837 at *17 (S.D.N.Y. Mar. 5, 2013). "In examining this factor, the courts compare all aspects of the products, including price, style, intended use, target clientele, typical distribution channels, and others." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 316 (S.D.N.Y. 2000) *aff'd sub nom. Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d

1262, 2000 WL 1721126 (2d Cir. 2000).   Again, Plaintiffs simply conclude, *sans* citation to evidentiary support, that these factors favor Plaintiffs.  *See* Plaintiffs' Moving Papers at 22.  Such a proffer fails to meet its heavy evidentiary burden here.  Having had an opportunity to initially carry its burden on these factors, Plaintiffs have waived any right to meet their burden on these *Polaroid* factors going forward.

As for the fifth *Polaroid* factor, Plaintiffs contend that Hopkins' readers have been "actually confused by the use of the Infringing Marks in the market place."  *See* Plaintiffs' Moving Papers at 26, and the Complaint refers to "numerous consumers indicating that there is confusion," Complaint at ¶ 62, and cites to Exhibit P thereto as evidence of this.  Exhibit P, however, consists of what appear to be, at most, three comments on an unnamed website or social media platform apparently addressing Ms. Hopkins.  These snippets are hearsay and, in any event, are wholly devoid of context such that it is not at all clear what transpired.  Moreover, the first and third snippets do not identify any titles or authors, so it is unclear whether any confusion referenced therein has anything to do with the issues or parties in this proceeding.  Tellingly, the second snippet specifically references "Cocky Chef"—a title that is *not* associated with any Defendant in this action.  Such evidence is uncompelling and should not be considered sufficient by any means to meet Plaintiffs' heavy burdens here.

As for the sixth *Polaroid* factor, Plaintiffs have no clear or consistent theory of bad faith and are clearly attempting to divert attention from the fact that they are the ones who are acting with malicious intent.  Initially, Plaintiffs cite case law establishing that bad faith exists when a defendant deliberately adopts another's name to obtain advantage from the Plaintiffs' goodwill in the mark.   Immediately thereafter, Plaintiffs contend that the COCKTALES anthology is "intended to smear, by association, the reputation of the Plaintiffs." *See* Plaintiffs' Moving Papers at 25.  Plaintiffs then concede that anthology authors represent a "who's-who of best

selling novelists, who are have [sic] all joined in this vicious cause." *Id.*   Thus, this chimera argument argues that the COCKTALES authors, *i.e.,* forty well-known source-indicators of romance novel services, are ***not*** trading off Faleena Hopkin's name, brand, and goodwill to create commercial advantage, but instead, "like a pack of blood-thirsty wolves," (*Id.*) are destroying Ms. Hopkin's reputation by adopting *cocky* titles for an anthology that conspicuously *exclude* Hopkins as a source.   In other words, the COCKTALES authors have no need to trade off the name and brand of Faleena Hopkins, are somehow "diluting Plaintiffs' trademarks" by adopting a "trademark" that, in fact, Ms. Hopkins never used ***as a trademark***.   Plaintiffs cannot have it both ways—either they are accusing the Defendants of using the word COCKY in attempt to smear Ms. Hopkins or they are accusing the Defendants of using COCKY to trade off Hopkins' "valuable" goodwill.

In reality, COCKY is merely a phantom mark for the Plaintiffs, *i.e.*, a trademark that contains a variable element to the mark as a whole.   TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1214.01.   For Hopkins' "The Cocker Brothers" and "The Cocker Series," the word *cocky* is always used in combination with other (more distinctive elements), including the book titles *Cocky Mother's Day: A Holiday Novella* and *Cocky By Association: Sean and Celia*.   As the Federal Circuit explained, the reason such phantom marks are not entitled to registration is because:

> "the mark, as registered must accurately reflect the way it is used in commerce so that someone who searches the registry for the mark, or a similar mark, will locate the registered mark. 'Phantom' marks . . . encompass too many combinations and permutations to make a thorough and effective search possible. The registration of such marks does not provide proper notice to other trademark users, thus failing to help bring order to the marketplace and defeating one of the vital purposes of federal trademark registration."

*In re Int'l Flavors & Fragrances Inc.*, 51 USPQ2d 1513, 1517-18 (Fed. Cir. 1999).

In short, Ms. Hopkins is the one who, knowing that she cannot register the title of a single work as a trademark, misrepresented her trademark usage to identify a common term within a group of single titles, thereby obtaining registration of a phantom mark she thereafter used to harass her follow authors.  In other words, to the extent that any bad faith is evident in this dispute, Plaintiffs are the only real source of it.[6]

As for the seventh *Polaroid* factor (the quality of Defendants' products), there does not seem to be any dispute.  In any event, Plaintiffs fail to cite any evidence in support of this factor. Having had an opportunity to initially carry its burden, Plaintiffs have waived any right to meet their burden on this *Polaroid* factors going forward.

In terms of the eighth *Polaroid* factor, Plaintiffs cite no case nor offer any other evidence to support their contention that consumers of romance novels are unsophisticated buyers that do not exercise care in purchasing books, contending that they are guided only by scintillating covers and titles.  Indeed, Plaintiffs actively insult their readership by wholly disregarding their ability and inclination to identify and purchase books based on who the author is, recommendations they have received, reviews they have read or what a book is about. Moreover, all signs point to romance consumers being voracious readers and devoted fans, and to romance authors being generally engaged with their readership communities.

Finally, in spite of its high burden, Plaintiffs' motion relies upon a single declaration from one of the Plaintiffs (Faleena Hopkins) (the "Hopkins Declaration"), who is also the sole

---

[6] Plaintiffs further chastise the COCKTALES Authors for publishing the anthology in lieu of "support[ing]their legal positions with substantive facts and applicable law," which Plaintiffs concurrently dismiss sight-unseen as "meritless," albeit "respectfully." *See* Plaintiffs' Moving Papers at 25, n.10.  It should not go without saying that Plaintiffs' inconsistent bad faith arguments here further extend to Defendant Kneupper, who clearly *did* take the path Plaintiffs chastise the COCKTALES authors for avoiding by filing a well-supported and detailed cancellation petition, only to end up at the same destination as the other defendants and otherwise painted with same brush.

{10620/609817-000/01960501.1}

principal of the other Plaintiff (Hop Hop Productions).   The Hopkins Declaration is full of unsupported or conclusory statements made without foundation, that lack support, or that are demonstrably false.   In any event, Plaintiffs' "evidence" fails to show a substantial likelihood of confusion as to source, which is fatal to the instant application.

**5.      Plaintiffs Have Not Shown A Substantial Likelihood of Prevailing on Its Declaratory Judgment Claims Against to Mr. Kneupper**

Plaintiffs seek an order of this Court dismissing with prejudice the Petition to Cancel Plaintiffs' Registered Trademarks that Mr. Kneupper filed with the TTAB.   Among other bases, Plaintiffs argue that Mr. Kneupper's petition "fails to submit any probative evidence that the name "cocky," in the minds of the consuming public, denotes (in this case) all romance novels in a series and not (instead) the source of the actual books, which in this matter would be Hopkins." *See* Plaintiffs' Moving Papers at 29 (parentheticals original).   Plaintiffs cite no authority whereby Petitions to Cancel (*i.e.,* notice pleadings) require contemporaneous submission of "probative evidence" in order to be valid (and Defendants are aware of none).

Further, Plaintiffs cite no authority whereby this Court's inherent powers to control its own docket also transcend the separation of powers, extending to the dockets of other tribunals sitting in other branches of the U.S. government.   For its part, the TTAB does not understand federal courts to have this power. Specifically, the Trademark Trial and Appeal Board Manual of Procedure ("TBMP"), states that "[s]uspension of a Board proceeding pending the final determination of another proceeding is solely with in the discretion of the Board; ***the court in which a civil action is pending has no power to suspend proceedings in a case before the Board***, nor do parties or their attorneys."   TBMP § 510.02 (emphasis supplied).[7]   For authority, § 510.02, *Opticians Assoc. v. Independent Opticians*, 734 F.Supp. 1171 (D.N.J.), *rev'd*

---

[7] Available at https://tmep.uspto.gov/RDMS/TBMP/current (as of May 31, 2018).

*on other grounds*, 920 F.2d 187 (3d Cir. 1990), an opinion denying a preliminary injunction and

otherwise case directly on point with this case, holds, in relevant part, that:

> "As a final matter, plaintiff seeks a stay of the cancellation proceeding before the TTAB. The power to stay proceedings flows from the power inherent in the court to schedule disposition of the cases on its docket with the goal of promoting fair and efficient adjudication." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936); *Gold v. Johns–Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir.1983). **Because this court exercises no control over the docket of the TTAB, it lacks the power to stay its proceedings. The power to stay a cancellation proceeding resides only in the Board itself.** *The Other Tel. Co. v. Connecticut Nat. Tel. Co.*, 181 U.S.P.Q. 779, 782 (Com'r 1974). Accordingly, the request for a stay of the cancellation proceeding will be denied."

*Id.* at 1181 (emphasis supplied).   In light of the above, it is respectfully submitted that

this Court should not reach a different result that *Opticians*.

### B.    Plaintiffs Have Not Shown Irreparable Harm

#### 1.    Plaintiffs' Delay Precludes a Finding of Irreparable Harm

First and foremost, Plaintiffs' delay in seeking preliminary injunctive relief belies its

assertions that it will suffer irreparable harm in the absence of an immediate injunction.   The

Second Circuit has held that delay alone may "preclude the granting of preliminary injunctive

relief" because it "suggests that there is, in fact, no irreparable injury."   *Tough Traveler, Ltd. v.

Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citations omitted).   Moreover, a preliminary

injunction is premised on "the theory that there is an urgent need for speedy action to protect the

plaintiff's rights," and thus, "[d]elay in seeking enforcement of those rights [ ] tends to indicate

at least a reduced need for such drastic, speedy action."   *Citibank, N.A. v. Citytrust*, 756 F.2d

273, 276 (2d Cir. 1985) ("Significant delay in applying for injunctive relief [...] tends to

neutralize any presumption that infringement alone will cause irreparable harm pending trial, and

such delay alone may justify denial of a preliminary injunction for trademark infringement.").

*See also DISH Network, L.L.C. v. ABC, Inc. (In re AutoHop Litig.)*, No. 12 Civ. 4155 (LTS)

(KNF), 2013 U.S. Dist. LEXIS 143492, at *33-35 (S.D.N.Y. Sept. 18, 2013) (Delay negates a

{10620/609817-000/01960501.1}

showing of irreparable harm "because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief.") (citation omitted).

The period of delay is properly measured from (a) the time Plaintiffs first knew or should have known about the allegedly infringing conduct to (b) the date Plaintiffs filed the motion for a preliminary injunction. *See Total Control Apparel v. DMD Int'l Imps., LLC*, 409 F. Supp. 2d 403, 408 (S.D.N.Y. 2006) (measuring delay from the time the plaintiff "knew or should have known about the infringement"). In this case, Plaintiffs delayed far too long to be entitled to the extraordinary relief they are now seeking, having waited *nearly ten months* after they first learned of Defendant Crescent's alleged infringement to move for a preliminary injunction. (*See* Cplt. ¶ 37.)[8] Indeed, courts within the Second Circuit routinely refuse to enter preliminary injunctions for trademark infringement when the moving party waits more than two months to seek relief, holding such lack of diligence undermines any claim of irreparable harm. *See Gidatex S.R.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (collecting cases). *See also, e.g., Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*, No. 00 Civ. 5746 (RO), 2001 WL 1097865, at *1 (S.D.N.Y. 2001) (denying motion for preliminary injunction in trademark case because three-month delay negates the plaintiff's claim of irreparable injury); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 281 (S.D.N.Y. 1998) (same); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896 (S.D.N.Y. 1995) (same); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976 (S.D.N.Y. 1989) (same even where there was a "serious possibility of confusion");

---

[8] Plaintiff's takedown notices to www.amazon.com and similar websites and opposition of Kneupper's petition for cancellation in the U.S. Patent and Trademark Office do not suffice to save Plaintiffs' untimely motion. *See Total Control Apparel*, 409 F. Supp. 2d at 408.

*Greenpoint Fin. Corp. v. The Sperry & Hutchinson Co., Inc*., 116 F. Supp. 2d 405 (S.D.N.Y. 2000) (four-month delay); *Cheng v. Thea Dispeker*, 35 U.S.P.Q.2d 1493 (S.D.N.Y. 1995) (five-month delay); *Origins Nat'l Res., Inc. v. Kotler*, 2001 WL 492429 (S.D.N.Y. 2001) (four to six-month delay); *Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595 (S.D.N.Y. 1996) (six to nine-month delay); *National Football League Players Ass'n v. Nat'l Football League Props., Inc.*, 1991 WL 79325 (S.D.N.Y. 1991) (nine-month delay).

There is no explanation for Plaintiffs' too-long delay in asserting rights in the COCKY marks.  Not only did Plaintiffs know of allegedly widespread "infringing" use (*i.e.,* romance book titles incorporating the mark COCKY) several months prior to bringing the instant motion, but Plaintiffs knew, or should have reasonably known, of such use well prior to Plaintiffs' first use of COCKY.  Instead of acting, Plaintiffs slept on their rights.  Plaintiffs' late-filed application for preliminary injunctive relief should be denied on this basis alone.

## 2.    Plaintiffs Have Failed To Demonstrate Irreparable Harm

On top of Plaintiffs' lengthy delay, Plaintiffs have failed to demonstrate irreparable harm. Proof of "[i]rreparable harm" requires "an injury that is not remote or speculative but actual and imminent and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (citation omitted). The party seeking the extraordinary relief bears the burden of showing that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[T]he mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction." *REDF Organic Recovery, LLC v. Kafin*, No. 12 Civ. 7973 (JFK), 2012 WL 5844191, at *2 (S.D.N.Y. Nov. 19, 2012). Courts may no longer presume irreparable injury in connection with intellectual property claims. *E.g., New Look Party Ltd. v. Louise Paris Ltd*., No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *3 (S.D.N.Y. Jan. 11, 2012).

### C.     The Balance of Hardships Favors Defendants

"A preliminary injunction may not issue unless the movant clearly shows that the balance of equities is in its favor." *Alzheimer's Found*., 2015 WL 4033019, at *13. Plaintiffs have made no such meritorious showing; to the contrary, the evidence demonstrates that the balance tips decidedly in favor of Defendants.  Plaintiffs proffer no support for their contention that they will suffer "massive" irreparable harm absent a preliminary injunction; instead they make vague allusions to tarnishment of reputation and loss of recognition. MOL pp. 26-27.   Plaintiffs, however, chose to enter a crowded field of titles including the term "cocky."  They knew they would coexist alongside other "cocky" titles, and the declarations within Plaintiffs' trademark applications either concede the ability of such designations to coexist, or else are patently false. Moreover, Plaintiffs have admitted that common use of "cocky" within titles is not likely to cause confusion as to source or affiliation and have publicly proclaimed that they have not suffered lost sales. (Crescent Decl. ¶¶ 10; 20).

Such theoretical, undefined "hardships" pale in comparison to the real, concrete ones that Defendants would endure if they were required to pull products from the marketplace. Defendants would suffer lost sales while they re-titled and rebranded their works.   Their significant marketing efforts and goodwill generated in their titles to date would be squandered. It should be noted that *Cocktales* currently sits at #25 on the USA Today Best Selling Books List.  (Emerson Decl. ¶ 14, Ex. L); *see, e.g., Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16-cv-5079 (JGK), 2016 WL 4367990, at *8-9 (S.D.N.Y. Aug. 12, 2016) (balance of equities favored defendant where it had already expended many resources to organize and promote its planned event).   Defendants would also incur costs in making unnecessary changes.   Moreover, Defendants would be deprived of their freedom of artistic expression.

> **D.  A Preliminary Injunction Limiting Use of the Term COCKY Is Not In the Public Interest**

In addressing requests for equitable relief courts must "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Alzheimer's Found.*, 2015 WL 4033019, at *13.  Plaintiffs contend the public has an interest in not being deceived. That may be so, but Plaintiffs have not come close to demonstrating that anyone has been or will be deceived.  There is no public interest in the disruption that would result from pulling published books from the shelves to be re-named.  There is, in contrast, a strong public interest in freedom of expression.  Furthermore, no public interest would be served by delaying adjudication of Kevin Kneupper's cancellation proceeding on the merits.  To the contrary, considering the fervor that has propelled *Cocktales* to #25 on the USA Today Best Selling Books List, it appears that there is a strong public interest in permitting that cancellation proceeding to move forward so that the fundamental issues of registrability underlying #cockygate can be meaningfully resolved.

## III.  CONCLUSION

In view of the foregoing, Defendants respectfully request that Plaintiffs' request for preliminary injunctive relief be denied in its entirety.

Dated:  May 31, 2018

Respectfully submitted,

Cameron S. Reuber
Lauren Emerson
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Phone: (914) 288-0022
Fax: (914) 288-0023
Email: reuber@leasonellis.com
Email: emerson@leasonellis.com

## <u>CERTIFICATE OF SERVICE</u>

I, Cameron S. Reuber, hereby certify that on May 31, 2018, a true and correct copy of the foregoing DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER was served via operation of the Court's ECF filing system, as well as by email sent by the undersigned, upon the following counsel of record:

**Christopher Scott Cardillo**
C. Cardillo, P.C.
9728 3rd Avenue, Suite 308
Brooklyn, NY 11209
646-398-5025
Fax: 646-365-8833
Email: cardilloesq@gmail.com

*Attorneys for Plaintiffs*

_____
Cameron S. Reuber (CR 7001)
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Phone: (914) 288-0022
Fax:  (914) 288-0023
Email: reuber@leasonellis.com