UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

HOP HOP PRODUCTIONS, INC.,
and FALEENA HOPKINS,

Civil Action No.:

*18-CV - 4670*

PLAINTIFFS,

- against -

KEVIN KNEUPPER, TARA CRESCENT,
and JENNIFER WATSON,

Defendants.

-----------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Dated: May 25, 2018
      Brooklyn, NY

C. Cardillo, P.C.
/s/ Chris Cardillo, Esq.
By:  Chris Cardillo, Esq. (cc7769)
Attorneys for Plaintiffs
9728 3rd Avenue, Suite 308
Brooklyn, NY 11209
T. 646-398-5025
F. 646-365-8833
C. 347-309-0000
Email: cardilloesq@gmail.com

Table of Contents

INTRODUCTION ……………………………………………………………………1

THE PLAINTIFFS' TRADEMARKS ……………………………………………………3

HOPKINS' COCKY NOVEL SERIES ……………………………………………………4

DEFENDANT CRESCENT'S ILLEGAL USE OF PLAINTIFFS' TRADEMARKS …………6

DEFENDANT WATSON'S ILLEGAL USE OF PLAINTIFFS' TRADEMARKS
AND THE RELATED SOCIAL MEDIA CAMPAIGNS ……………………………………7

LEGAL STANDARDS ……………………………………………………………………8
      A.     Jurisdiction & Declaratory Relief ……………………………………8
      B.     Trademark ……………………………………………………………10
            1.     Types of Trademarks …………………………………………11
      C.     Infringement Under Federal Law ……………………………………12
      D.     Descriptive Marks and Secondary Meaning ……………………………13
      E.     Protection as a "Series" of Works ……………………………………14
      F.     Trademark Infringement Under New York State Common Law …………15
      G.     Injunctive Relief …………………………………………………………16
            1.     Under the Federal Standard …………………………………16
            2.     Under the New York State Common Law Standard ……………17
            3.     Under New York State General Business Law § 360–l …………17

ARGUMENT ………………………………………………………………………………18

   I.     Plaintiff Is Likely to Succeed on Her Claims …………………………………18
      A.     PLAINTIFFS' Federally Registered Trademarks are
            Valid and Enforceable Under the Lanham Act …………………………18
      B.     PLAINTIFFS' Federally Registered Trademarks are Valid and
            Enforceable Under New York Common Law
………………………..19
            1.     Defendants Infringing Marks Cause a Likelihood of Confusion
                With PLAINTIFFS' Federally Registered Trademarks …………………19
            a.     The Infringing Marks are Substantially Identical ………………21
            b.     The Goods are Identical ……………………………………………22
            c.     The Trade Channels in Commerce are Identical ………………..22
            d.     PLAINTIFFS' Word Mark and Stylized Mark are Strong ……...22
            e.     Romance Novel Series Consumers Do Not Exercise a High
                Degree of Care ………………………………………………………23
            f.     Defendants' Use of the Infringing Marks is in Bad Faith ………24
            g.     There is Actual Confusion in the Market Place ………………...26

   II.    The Balance of Hardships Weights Heavily in Favor of PLAINTIFFS ………..27

III.   The KNEUPPER Petition to Cancel the Word Mark Should Be Dismissed with
       Prejudice ……………………………………………………………………………...28

CONCLUSION ……………………………………………………………………………………30

## Table of Authorities

**Statutes, Rules, Texts and Manuals**

| Statute Cite | Page # |
|---|---|
| 5 U.S.C. § 1065 (Section 15 of the Lanham Act) | 18 |
| 5 U.S.C. § 1115(b) (Section 15 of the Lanham Act) | 18 |
| 15 U.S.C. § 1051 (Section 15 of the Lanham Act) | 2 |
| 15 U.S.C. § 1071 (Section 15 of the Lanham Act) | 10, |
| 15 U.S.C. § 1114 (Section 15 of the Lanham Act) | 2, 12 |
| 15 U.S.C. § 1119, Concurrent Jurisdiction with USPTO | 8 |
| 28 U.S.C. §§ 2201 (Declaratory Judgment Act) | 2,9 |
| 28 U.S.C. §§ 2202 (Declaratory Judgment Act) | 2,9 |
| Federal Rule of Civil Procedure 65(a) | 1 |
| McCarthy on Trademarks and Unfair Competition (4th ed. 1997), § 15.04[4][b]; § 23.02[1] | 26 |
| Trademark Manual of Examining Procedure § 1202.09(a)(ii)(A) | 15 |
| Trademark Manual of Examining Procedure § 1202.08(c) | 15 |
| Trademark Manual of Examining Procedure § 1202.08(d)(ii) | 14 |
| NYS General Business Law § 360–l | 18 |
| NYS General Business Law, § 368-b | 15 |

**Cases**

| Case Cite | Page # |
|---|---|
| 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 815 F.2d 8 (2d Cir. 1987) | 13, 19 |
| Academy of Motion Picture Arts & Sciences v. Creative House Promos., Inc., 944 F.2d 1446 (9th Cir. 1991) | 24 |
| AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) | 24 |
| Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc., 288 F. Supp. 2d 105 (D.N.H. 2003) | 22 |
| Allied Maintenance Corp. v. Allied Mechanical Trades, Inc. 42 N.Y.2d 538, N.Y.S. 2d 628, 369 N.E. 2d 1162 (1977) | 16, 26 |
| Anti-Monopoly, Inc. v. General Mills Fun Group, 611 F. 2d 296 55, A.L.R. Fed. 223 (1979) | 29 |
| Bill Blass, Ltd. v. Saz Corp., 751 F.2d 152 (3d Cir. 1984) | 16 |
| Brookfield Communications, Inc. v. W. Coast Ent. Corp., 174 F.3d 1036 (9th Cir. 1999) | 12, 22, 24 |
| Cadence Design Systems v. Avant! Corp., 125 F.3d 824 (9th Cir. 1997) | 28 |
| Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217 (2d Cir. 1987) | 13, 19, 23 |
| Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, (2d Cir. 2012) | 12 |
| Citibank, N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985) | 16-17 |
| Clinique Laboratories, Inc. v. Dep Corp., 945 F.Supp. 547 (S.D.N.Y. 1996) | 22 |
| Cmax, Inc. v. Hall, 300 F. 2d 265 (9th Cir. 1962) | 9 |
| C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14 (2d Cir. 1985) | 21 |
| Clinique Labs., Inc. v. Dep Corp., 945 F. Supp. 547 (S.D.N.Y. 1996). | 26 |

| | |
|---|---|
| *CytoSport, Inc. v. Vital Pharmaceauticals, Inc*, (E.D. California 2009) 617 F. Supp. 2d 1051 | 17 |
| *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503 (US 2nd Cir. 1997) | 12, 23 |
| *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561 (S.D.N.Y. 2015). | 19 |
| *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457 (N.D. Cal. 1991) | 20 |
| *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) | 21, 24 |
| *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848 (2d Cir. 1988) | 9, |
| *Gruner + Jahr USA Printing & Publishing v. Meredith Corp.*, 991 F.2d 1072 (1993) | 13 |
| *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) | 21, 23 |
| *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96 (E.D.N.Y. 2012) | 18 |
| *In re Majestic Distilling Co.*, Inc., 315 F.3d 1311 (Fed. Cir. 2003) | 23 |
| *Ivy League Sch., Inc. v. Danick Indus., Inc.*, 44 Misc. 3d 1223(A), 999 N.Y.S.2d 797 (N.Y. Sup. 2014) | 15 |
| *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489 (S.D.N.Y. 2013) | 17 |
| *Kalologie Fran. LLC v. Kalologie Skincare Med. Group of California*, CV 14-00016 DDP VBKX, 2014 WL 953442, (C.D. Cal. Mar. 11, 2014) | 27 |
| *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir. 1980) | 19 |
| *Lois Sportswear v. Levi Strauss & Co.*, 799 F.2d 867 (Ct. Ap 2nd Cir. 1986) | 19 |
| *Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, No. 01 CIV. 0849 (JGK), 2002 WL 1560789 (S.D.N.Y. July 15, 2002) | 10 |
| *Martin Paint Stores, Inc. v. Bartin Paints, Inc.*, 1980 WL 39082 (N.Y. Sup. Ct. Aug. 15, 1980) | 15 |
| *Matter of Fireman's Assn. of State of N.Y. v. French Am. School of N.Y.*, 41 A.D.3d 925, 839 N.Y.S.2d 238 (3d Dept. 2007) | 17 |
| *Munro v. Beadle*, 8 N.Y.S. 414 (Gen. Term 1890) | 16 |
| *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 800 N.Y.S.2d 48, 833 N.E.2d 191 (2005) | 17 |
| *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) | 12 |
| *Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) | 20 |
| *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75 (1st Cir. 1996) | 9 |
| *PowerFood, Inc. v. Sports Sci. Inst.*, C-93-0259 MHP, 1993 WL 13681782 (N.D. Cal. Mar. 11, 1993) | 21 |
| *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341˙F.Supp. 129 (S.D.N.Y. 1972) | 13, 19 |
| *Rhoades v. Avon Products, Inc.*, 504 F. 3d 1151 (2007) | 8, 9,10 |
| *Rogers v. Grimaldi*, 875 F.2d 994 (2013) | 13 |
| *Savin Corp. v. Savin Grp.*, 391 F.3d 439 (2d Cir. 2004) | 20 |
| *Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25 (2d Cir. 1978). | 26 |
| *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279 (S.D.N.Y. 1997) | 13 |
| *Scotch & Soda B.V. v. Scotch and Iron LLC*, 2018 WL 2224997 (S.D.N.Y. 2018) | 12 |
| *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373 (2d Cir. 2005) | 19 |
| *Starbucks Corp. v. Heller*, CV 14-01383 MMM MRWX, 2014 WL 6685662 (C.D. Cal. Nov. 26, 2014) | 27 |
| *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739 (2d Cir. 1998) | 12 |

| | |
|---|---|
| *Synergistic Intern. Inc. v. Windshield Doctor, Inc.*, 2003 WL 21468568 (C.D. Ca. 2003) | 24 |
| *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002) | 13 |
| *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208 (Ct App 2nd Circuit 1985) | 12 |
| *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330 (9th Cir. 1995) | 27 |
| *Tri–Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 749 F. Supp. 1243 (S.D.N.Y.), *aff'd*, 17 F.3d 38 (2d Cir. 1994)). | 13-14 |
| *Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd*, 2006 WL 1214859 (N.D. Ca 2006) | 20 |

## Trademark Trial and Appeals Board Decisions

| | |
|---|---|
| *Cooper*, 117 USPQ 396 (C.C.P.A. 1958) | 14 |
| *Mattel Inc. v. The Brainy Baby Co., Cancellation No. 92052047*, 101 USPQ.2d 1140, (TTAB 2011) | 15 |
| *In re Posthuma*, 45 USPQ2d 2011(TTAB 1998) | 14 |
| *In re Scholastic Inc.*, 23 USPQ.2d 1774 (TTAB 1992) | 15 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

HOP HOP PRODUCTIONS, INC.,
and FALEENA HOPKINS,

Civil Action No.:

PLAINTIFFS,

**MEMORANDUM OF**
**LAW IN SUPPORT OF**
**OF PLAINTIFFS'**
**MOTION**

- against -

KEVIN KNEUPPER, TARA CRESCENT,
and JENNIFER WATSON,

Defendants.

------------------------------------------------------------------------X

PLAINTIFFS, HOP HOP PRODUCTIONS, INC. (hereinafter "HOP"), and FELEENA

HOPKINS (hereinafter "HOPKINS" and collectively "PLAINTIFFS"), by their attorneys C.

Cardillo, P.C., as and for a Memorandum of Law, submitted in support of PLAINTIFFS' instant

motion for (1) a Preliminary Injunction against the Defendants TARA CRESCENT (hereinafter

"CRESCENT") and JENNIFER WATSON (hereinafter "WATSON"), pursuant to Federal Rule

of Civil Procedure 65(a), and (2) to dismiss with prejudice the pending Petition for Cancellation

(hereinafter "Petition) brought by the Defendant KEVIN KNEUPPER (hereinafter

"KNEUPPER")  before the Trademark Trial and Appeals Board ("TTAB")[1] sets forth as follows:

## INTRODUCTION

HOPKINS is a well-known and best-selling author of a series of romance novels, who

self-publishes her work for sale to the public across the United States and the world, via internet

sales through sites like Amazon.com.

HOPKINS has, over the course of many years, established a significant reputation in the

genre of romance novels.

---

[1] Attached to the Verified Complaint as Exhibit "A".

This is an action seeking, *inter alia*, that PLAINTIFFS' use of their federally registered trademarks (as set forth hereinafter in detail), used in connection with the publication of series of books, are valid, and that the Defendants CRESCENT and WATSON are infringing upon the rights of PLAINTIFFS by their simultaneous use of confusingly similar and/or identical marks (hereinafter collectively "Infringing Marks").

PLAINTIFFS set forth, in detail herein, that the Defendants CRESCENT and WATSON are using the Infringing Marks in connection with identical goods (other written and published works), which has caused actual consumer confusion.

As such, PLAINTIFFS respectfully submit that a declaratory ruling is necessary to clarify PLAINTIFFS' rights in their trademarks.

PLAINTIFFS further set forth, also in detail herein, that the pending Petition for Cancellation (hereinafter "Petition") brought by KNEUPPER before the TTAB, attached to the Verified Complaint as **Exhibit "A"**, which seeks to cancel the word mark "cocky," should be dismissed with prejudice.

PLAINTIFFS request that this Court order the Defendants CRESCENT and WATSON, be enjoined and restrained from publishing, promoting, selling, distributing any works which infringe upon the PLAINTIFFS' trademarks, including but not limited to the "Cocktales, The Cockiest Anthology" (hereinafter "Cocktales"), or any publications which include the Federally Registered Trademarks, or any similar variations thereof meant to confuse the public.

PLAINTIFFS assert these requests for relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201- 2202, and their rights under the Trademark Act of July 5, 1946, as amended, commonly known as the Lanham Act, 15 U.S.C. § 1051, as well as New York State statutory and common law.

PLAINTIFFS bring the following causes of action in their Complaint (**Exhibit "1"**):

**COUNT I**: Trademark Infringement, Unfair Competition, False Designation of Origin and Passing Off Under the Federal Lanham Act (15 U.S.C. § 1114);

**COUNT II**: Trademark Infringement, Unfair Competition False Designation of Origin and Passing Off Under New York Common Law;

**COUNT III**: Unfair Competition Under New York Common Law; and,

**COUNT IV**: Dismissal of the Petition of KNEUPPER with Prejudice and for a Declaratory Judgment.

## THE PLAINTIFFS' TRADEMARKS

HOP is the owner of three (3) Federally Registered Trademarks, two of which are the subject of this lawsuit. Those two trademarks (hereinafter collectively referred to as "Federally Registered Trademarks") are as follows:

| Mark | Registration No. | Goods/Services |
|---|---|---|
| **COCKY** (hereinafter "Word Mark") | 5,447,836 | Class 9: a series of downloadable e-books in the field of romance. Class 16: a series of books in the field of romance. |
| *cocky* (hereinafter "Stylized Mark") | 5,458,137 | Class 9: a series of downloadable e-books in the field of romance. Class 16: a series of books in the field of romance. |

The Federally Registered Trademarks have been individually approved, after application, duly issued by the United States Patent and Trademark Office (hereinafter "USPTO") and are currently valid and subsisting. The applicable applications, USPTO responses, and registrations are attached hereto as follows:

**Exhibit "E"[2]**   Trademark Application: Word Mark;
**Exhibit "F"**   Trademark Registration: Word Mark;
**Exhibit "G"**   Trademark Application: Stylized Mark; and,
**Exhibit "H"**   Trademark Registration: Stylized Mark.

In the context of the Word Mark and the Stylized Mark, the protection that the PLAINTIFFS seek is extremely specific: It is limited to the use of the (1) word "Cocky" (2) as a title, and (3) in the context of a romance novel.

Conversely, the aim of these proceedings is not to stop people to use the word "Cocky" in the conjunction with book titles.  However, it is an attempt to protect the series titled "cocky" and to enjoin people from using the word "cocky" in a series or in an attempt to confuse consumers.

### HOPKINS' COCKY NOVEL SERIES

HOPKINS uses the Federally Registered Trademarks in and as the title of her romance novels.

To date, HOPKINS has commercially released and sold a series of nineteen (19) novels, the latest being released on May 15, 2018, embodying the Federally Registered Trademarks (collectively the "HOPKINS' COCKY NOVEL SERIES" and individually a "COCKY NOVEL") (please see the cover of each COCKY NOVEL in the HOPKINS' COCKY NOVEL SERIES attached to the Verified Complaint as **Exhibit "I"[3]**).

---

[2] Exhibits "E" through "H" refer to exhibits attached to the Verified Complaint.
[3] https://www.amazon.com/gp/product/B07D3QJ8RQ/ref=series_rw_dp_sw.

HOPKINS started using the word "Cocky" in the HOPKINS' COCKY NOVEL SERIES since June 16, 2016 (please see third page of website printout attached Verified Complaint as **Exhibit "J"**[4]).

In addition, PLAINTIFFS began using the Federally Registered Trademarks in connection with the HOPKINS COCKY NOVEL SERIES on or about July 5, 2017.

The HOPKINS COCKY NOVEL SERIES is marketed and sold, nationally and internationally, under the Federally Registered Trademarks via the internet as digital downloads, hard copy books, and audio books.

In each of the COCKY NOVELS, the Federally Registered Trademarks are prominently and consistently featured as part of the title.

In each of the COCKY NOVELS, by using a different font, size and color, the Federally Registered Trademarks stand out from the rest of the title creating a separate commercial impression.

The COCKY NOVELS and the HOPKINS COCKY NOVEL SERIES are consistently and regularly promoted using the Federally Registered Trademarks.

It is the intention of PLAINTIFFS to continue to use the Federally Registered Trademarks in future written publications (novels, etc.), as well as possibly other mediums (movies, television, etc.), for the purposes of extending the stories, characters, themes and content related to the HOPKINS COCKY NOVEL SERIES.

PLAINTIFFS have expended substantial time and money to promote, advertise, market and expand the HOPKINS COCKY NOVEL SERIES throughout the United States and

---

[4] https://www.amazon.com/gp/product/B01H7RZDR8/ref=series_dp_rw_ca_1.

internationally and plan to continue to expand substantially their promotion throughout the United States and internationally.

Since its first use in commerce, PLAINTIFFS have made a substantial monetary, marketing, and time commitment and investment in the HOPKINS COCKY NOVEL SERIES and has developed significant goodwill in the HOPKINS COCKY NOVEL SERIES, and the Federally Registered Trademarks.

As a result, of the notoriety of HOPKINS' and her writing, as well as the popularity of the HOPKINS COCKY NOVEL SERIES, the Federally Registered Trademarks have become well known to consumers throughout the United States and internationally as originating with HOPKINS. The continuation of this recognition is critical to maintaining and expanding interest by potential purchasers of HOPKINS published and printed works, as well as her future published works, which is also essential to the viability of HOPKINS' future sales and income.

HOPKINS intends to expand the product line of novels which encompass the themes, story lines and characters of the HOPKINS COCKY NOVEL SERIES into future novels, which will also incorporate the Federally Registered Trademarks.

Loss of the ability to use and enforce the Federally Registered Trademarks would have substantial adverse effect on HOPKINS' current and future novel sales, with a corresponding loss of income, as well as a loss of value in her published works.

## DEFENDANT CRESCENT'S ILLEGAL USE OF PLAINTIFFS' TRADEMARKS

On or about August 22, 2017 the CRESCENT published "Her **Cocky** Doctors (*emphasis added*), A MFM Ménage Romance, The *Cocky Series* Book 1 (*emphasis added*)" (please see book cover attached to the Verified Complaint as **Exhibit "K"**).

On or about November 12, 2017 the Defendant CRESCENT published an audio book entitled "Her **Cocky** Firefighters (the two books collectively referred to as "Crescent Violations") (*emphasis added*), A MFM Ménage Romance, The *Cocky Series* Book 2 (*emphasis added*)" (please see book cover attached to the Verified Complaint as **Exhibit "L"**).

It should not be mistaken that CRESCENT was fully aware of the HOPKINS' COCKY NOVEL SERIES.  In fact, CRESCENT, for at least four (4) months prior to the first Crescent Violation, helped promote the HOPKINS' COCKY NOVEL SERIES (please see communication attached to the Verified Complaint as **Exhibit "M"**).

As such, CRESCENT knowingly and purposefully incorporated the Federally Registered Trademarks into her novels in an effort to confuse the consumer into believing these publications were part of the HOPKINS' COCKY NOVEL SERIES.

Upon HOPKINS further review, it was apparent that CRESCENT was purposely and intentionally, in an effort to increase her book sales, using HOPKINS' reputation and previous use of her Federally Registered Trademarks in commerce as a means of associating her novels with HOPKINS.

In response to this revelation, HOPKINS, on or about August 24, 2017 sought additional protection by retaining an attorney, and applying for, and subsequently being granted, the Federally Registered Trademarks.

Soon after, HOPKINS made a written demand to CRESCENT to cease and desist use of her Federally Registered Trademarks.

To date CRESCENT has continued to sell her novels using the Federally Registered Trademarks in violation of PLAINTIFFS' rights.

## DEFENDANT WATSON'S ILLEGAL USE OF PLAINTIFFS' TRADEMARKS AND THE RELATED SOCIAL MEDIA CAMPAIGNS

In response to the PLAINTIFFS' attempts to enforce their trademarks, elements of the indie writing world reacted by banding together, via social media, to publicly object: for example, by using the Twitter hashtag #cockygate (please see Twitter printout attached to the Verified Complaint as **Exhibit "N"**).

A major objective of the various social media campaigns has simply been to personally attack and smear the reputation of the PLAINTIFFS, as well as the COCKY ROMANCE NOVEL SERIES, and to cause emotional and economic harm. Toward that end, WATSON has participated and organized the publication and distribution of Cocktales (please see website printouts attached to the Verified Complaint as **Exhibit "O"**)[5].

As is clear from **Exhibit "O"**, WATSON, upon information and belief, intentionally and purposefully incorporated the Word Mark and Stylized Mark into the website and intends to incorporate them into Cocktales itself.

In addition, according to the website, https://www.cockyauthors.com/about-cocktales, Cocktales is scheduled to be published and released to the public on May 26, 2018. As such, time is of the essence in regard to Plaintiff's request for an injunction.

## LEGAL STANDARDS

### A. Jurisdiction & Declaratory Relief

The Court shares concurrent jurisdiction over the cancellation of a trademark registration

---

[5]

https://www.cockyauthors.com/,
https://docs.google.com/forms/d/e/1FAIpQLSd18_cbqnLlA1x5UCZ5F02CcKkDQMCmeuvH3zRjZ9IjScfPXQ/viewform,
https://www.facebook.com/SocialButterflyBooks/posts/2136591423021050

with the USPTO (15 U.S.C. § 1119; see also *Rhoades v. Avon Products, Inc.*, 504 F. 3d 1151 (2007), (explaining that Congress permits proceedings in a "district court to challenge or affirm a federally registered mark in civil suits in which a federally registered mark is in issue, even without any prior resort to the [TTAB]").

Federal courts have the power to issue declaratory judgments pursuant to the *Declaratory Judgment Act.,* 28 U.S.C. §§ 2201, 2202. Under the primary jurisdiction doctrine, when "there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility" *Rhoades*, 504 F.3d at 1162; see also, *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 77-80 (1st Cir. 1996); *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 853-54 (2d Cir. 1988).

The pendency of a USPTO proceeding may be a proper basis to forestall an action for declaratory relief pursuant to 28 U.S.C. § 2201 in some circumstances. For example, when the action involves "only the issue of whether a mark is entitled to registration, it would make sense to resolve the registration claims at the TTAB first," *Rhoades*, 503 F.3d at 1165 (*internal quotation marks and citation omitted*).

By contrast, if "a potential infringement claim 'requires the district court to resolve much or all of [the registration issue], it would waste everyone's time not to settle the registration issue' in the district court," *Id.* (*quoting*: *PHC*, 75 F.3d at 81). The driving factor a court must consider is efficiency, *Id.*

Pursuant to *Rhoades*, a court should not decline jurisdiction under 28 U.S.C. § 2201 where there are pending infringement claims that "require the district court to resolve much or all" of the registration issues (*Rhoades*, 504 F.3d at 1165). Similarly, under *Cmax, Inc. v. Hall,* 300 F. 2d 265 (9th Cir. 1962) court should consider whether the stay would further "the orderly

course of justice measured in terms of the simplifying of complicating issues, proof, and questions of law," *Id.* at 268.

As such, district courts in this district have held that they should maintain jurisdiction "when [a matter involves] determining the likelihood of confusion in properly-instituted actions for trademark infringement or unfair competition…" *Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, No. 01 CIV. 0849 (JGK), 2002 WL 1560789, at 9 (S.D.N.Y. July 15, 2002). Thus, " courts routinely decide issues concerning registrability when determining the likelihood of confusion in properly-instituted actions for trademark infringement or unfair competition, and, hence, the issue of trademark registrability is not uniquely within the PTO's expertise," *Id.* (*citations omitted*).

Accordingly, this case should not be delayed as the Petition and the TTAB proceedings are subject to relitigation, which makes deferral to the TTAB inefficient as this matter involves a pending infringement claim. And the deciding factor in invoking primary jurisdiction should be efficiency, *Rhoades*, 504 F.3d at 1165.

Courts are disinclined to defer to TTAB proceedings on the grounds of efficiency where pending cases involve infringement claims. The USPTO does not have exclusive jurisdiction over trademark issues, and even after the TTAB proceedings have concluded, the "parties may litigate these issues in federal court without previously exhausting their claims before the TTAB, *Id.* at 1164; *see also*: 15 U.S.C. § 1071(b)(1). For example, a party that has not prevailed before the TTAB may appeal to the U.S. Court of Appeals for the Federal Circuit if no adverse party objects to the proceedings, 15 U.S.C. § 1071(a), or alternatively elect for a *de novo* judicial trial, 15 U.S.C. § 1071(b).

**B. Trademark**

## 1.     Types of Trademarks

A trademark offers legal protection for a word, symbol, phrase, logo, design, or combination of those that represents a source of goods or services. Types of trademarks for products include five main categories:

1. Generic Mark: the least likely to be awarded a trademark spectrum, and doesn't qualify for a trademark unless it includes more specific detail. One example of a generic mark is the phrase, "The Ice Cream Shop." Offering trademark protection on something this generic would restrict all other shops that sell ice cream.

2. Descriptive Mark: descriptive mark identifies one or more characteristics of a product or service and only serves to describe the product. It has unique elements that qualify it for protection under trademark laws such as it must have secondary meaning such as amount and manner of advertising, volume of sales, length and manner of the mark's use, or results of consumer surveys to qualify. This means that consumers must recognize the mark and identify it with the brand. To qualify as a descriptive mark, it should evolve from what the brand represents to who the brand represents.

3. Suggestive Mark: implies something about the good or service. A mark in this category typically qualifies for protection without requiring a secondary meaning. The term "suggestive" means that the customer must use the imagination to figure out what services or goods the company offers. One example is the luxury automotive brand, Jaguar. It suggests speed and agility but doesn't immediately convey a car manufacturer.

4. Fanciful Mark: A fanciful mark is a term, name, or logo that is different from anything else that exists. This category is the easiest for obtaining trademark protection because it typically doesn't compete with anything else or become too generic. Examples of

fanciful marks include Kodak, Nike, and Adidas. These words don't hold any meaning in
common language, so trademarking them doesn't infringe on the rights of other
companies that offer similar products; and,

5.  Arbitrary Mark: might include a term or phrase with a well-known meaning, but the
    meaning in its case is different. The best example of an arbitrary mark is Apple, the
    computer and electronics manufacturer. An apple is a familiar term, but in this case, the
    mark doesn't have anything to do with the general meaning of the term.

### C.      Infringement Under Federal Law

"To prevail on a trademark infringement claim under the Lanham Act, 15 U.S.C. § 1114,
a plaintiff must demonstrate: (1) "plaintiff's mark merits protection," and (2) "defendant's use of
a similar mark is likely to cause consumer confusion," *Scotch & Soda B.V. v. Scotch and Iron
LLC*, 2018 WL 2224997, at 2 (S.D.N.Y. May 15, 2018), (*citing*: *Christian Louboutin S.A. v. Yves
Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216-17 (2d Cir. 2012); *see also*: *Brookfield
Communications, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). "The issue
of likelihood of confusion turns on whether numerous ordinary prudent purchasers are likely to
be misled or confused as to the source of the product in question because of the entrance in the
marketplace of defendant's mark," *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d at 1508–09
(*internal brackets and quotation marks omitted*).

"To measure the likelihood of confusion, courts ordinarily will weigh the so-called
Polaroid factors: (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and
defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that
plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between
products; (6) defendant's good faith; (7) the quality of defendant's product as compared to

plaintiff's; and (8) the sophistication of the purchasers," *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) (*citing*: *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 213–14 (Ct App 2d Cir. 1985)).

Plaintiff is not required to prevail on all or even a majority of the factors (*e.g.*, *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) (in applying likelihood of confusion factors, "[t]he list of factors is not a scorecard—whether a party 'wins' a majority of the factors is not the point").

### D.    Descriptive Marks and Secondary Meaning

A descriptive mark is entitled to protection under the Lanham Act when it has acquired secondary meaning, that is to say, "an identity that consumers associate with a single source, even though the source itself may be unknown," *Gruner + Jahr USA Printing & Publishing v. Meredith Corp.*, 991 F.2d at 1076.

A mark acquires secondary meaning when "it [is] shown that the primary significance of the term in the minds of the consuming public is not the product but the producer," *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217 (2d Cir. 1987) at 1221, (*citing*: *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8, 10 (2d Cir. 1987); *quoting*: *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133 (S.D.N.Y.1972)).

In *Rogers v. Grimaldi*, the United States Court of appeals for the Second Circuit stated that "[t]he purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers*, 875 F.2d 994 (2013) at 997–98.

"A literary title can be misleading "in the sense that it induces members of the public to believe the book was prepared or otherwise authorized by PLAINTIFFS," *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 296 (S.D.N.Y. 1997).

Secondary meaning in a literary title occurs "where the title is sufficiently well known that consumers associate it with a particular author's work," *Rogers*, *supra* at 998 (*citing*: *Tri–Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 749 F. Supp. 1243, 1252 (S.D.N.Y.), aff'd, 17 F.3d 38 (2d Cir. 1994)

### E.     Protection as a "Series" of Works

As per the Trademark Manual of Examining Procedure ("TEMP") "An applicant may establish that the portion of the title of a creative work is used on a series by submitting more than one book cover or CD cover with the mark used in all the titles," TMEP § 1202.08(d)(ii).

As the TTAB has previously noted it one of its decisions, "The name of a series of works can be registered as a trademark even though the title of a single work cannot…The name for a series, at least while it is still being published, has a trademark function in indicating that each book of the series comes from the same source as the others. The name of the series is not descriptive of any one book and each book has its individual name or title. A series name is comparable to the title of a periodical publication such as a magazine or newspaper. While it may be indicative either specifically or by association in the public mind, of the general nature of the contents of the publication, it is not the name or title of anything contained in it. A book title, on the other hand especially one which is coined or arbitrary, identifies a specific literary work, of whatever kind it may be, and is not associated in the public mind with the publisher, printer or bookseller—the "manufacturer or merchant" referred to in the Trademark Act (Sec. 45, definition of Trademark). If a title is associated with anything, it is with the author for it is he

14 of 30

who has produced the literary work which is the real subject of purchase," *Cooper,* 117 USPQ at 400 (see also: *In re Posthuma*, 45 USPQ2d 2011, at 2014 (TTAB 1998): this is "well settled law").

As such, "[t]he title of a single creative work is, of necessity, descriptive of the work and does not function as a trademark," in contrast, the name of a series "has a trademark function in indicating that each book of the series comes from the same source as the others. The name of the series is not descriptive of any one book and each book has its individual name or title." *Mattel Inc. v. The Brainy Baby Co., Cancellation No. 92052047*, 101 USPQ.2d 1140, (TTAB Dec. 30, 2011) (*see also*: TMEP § 1202.08(c)).

*In re Scholastic Inc*., 23 USPQ.2d 1774, 1777 (TTAB 1992) held that "The Magic School Bus" functions as a mark for a series of books, where the record contained evidence of use of the designation displayed prominently on many different book covers, as well as evidence that applicant promoted the term as a series title, that others used the designation in book reviews to refer to a series of books, and that purchasers recognized the designation as indicating the source of a series of books (see also: TMEP § 1202.09(a)(ii)(A)).

### F.   Trademark Infringement Under New York State Common Law

Under New York common law, "an exclusive right may be acquired in a name, which will be protected against infringement by another who assumes it for the purposes of deception, or even when it is innocently used to detriment of another, and this nature is in the right of a trademark," *Martin Paint Stores, Inc. v. Bartin Paints, Inc.*, 1980 WL 39082, at 3 (N.Y. Sup. Ct. Aug. 15, 1980). This right is actionable to the extent that there exist "false descriptions or representations concerning the source of production and/or origin of a good or service by prohibiting any misrepresentation likely to cause confusion, mistake or deception about the

origin, source or sponsorship of a product or service," *Ivy League Sch., Inc. v. Danick Indus., Inc.*, 44 Misc. 3d 1223(A), 999 N.Y.S.2d 797 (N.Y. Sup. 2014).

In "an action for trade-mark infringement brought pursuant to…New York (General Business Law, s 368-b)…it is necessary to show that the defendant's use of the trade-mark is likely to cause confusion, mistake or to deceive; actual confusion need not be shown, *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 543, 369 N.E.2d 1162, 1165 (1977).

As is the case under the federal law, a series of books is entitled to protection under New York common law. This has been the common law in New York since (on or about) 1890, as in *Munro v. Beadle*, 8 N.Y.S. 414 (Gen. Term 1890), the Court held that publication of a series of stories entitled "Old Sleuth Library," and purporting to relate the adventures of a detective called "Old Sleuth," entitles the publisher to an exclusive right to the use of the word "Sleuth" in the titles of stories about detectives. In determining how the common word "sleuth" acquired meaning in the context of a series, the Court in *Murno* wrote:

> "The adoption of this word by the plaintiff seems to satisfy all the requirements made by the law governing common-law trade-mark…It answers the purpose of distinguishing the plaintiff's works from those of all others. It is not descriptive of the subject-matter of the manufacture or publication. It has no relation to the grade or quality of the novel. It was originally a fanciful and arbitrary word to indicate the publications of the plaintiff alone. By its adoption and use the plaintiff acquired in it a certain property right which is entirely independent of the statute laws pertaining to copyright, and should be protected."

## G. Injunctive Relief

### 1. Under the Federal Standard

"To obtain a preliminary injunction in this circuit, the moving party has the burden of showing (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief,"

*Citibank, N.A. v. Citytrust*, 756 F.2d 273, at 275 (2d Cir. 1985) (*internal quotation marks and citations omitted*; *see also*: *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 154 (3d Cir. 1984)).

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered," *Id.* at 275 (*internal quotation marks and citations omitted*).

"Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark because loss of control over one's reputation is neither 'calculable nor precisely compensable," *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 503 (S.D.N.Y. 2013) (*internal marks and citations omitted*).

## 2. Under the New York State Common Law Standard

Plaintiff is entitled to injunctive relief under New York State common law, if she can demonstrate that she has a likelihood of success on the merits, that she would sustain irreparable injury absent the grant of injunctive relief, and that the equities are balanced in her favor (*see*: *Nobu Next Door, LLC v. Fine Arts Hous., Inc.*, 4 N.Y.3d 839, 800 N.Y.S.2d 48, 833 N.E.2d 191 (2005); *Matter of Fireman's Assn. of State of N.Y. v. French Am. School of N.Y.*, 41 A.D.3d 925, 839 N.Y.S.2d 238 (3d Dept. 2007)).

## 3. Under New York State General Business Law § 360–l

New York Law, and pursuant to General Business Law § 360–l states:

"Injury to business reputation; dilution. Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

Accordingly, Plaintiff is entitled to a preliminary injunctive under the following standard: the "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

## ARGUMENT

### I.      Plaintiff Is Likely to Succeed on Her Claims

#### A.      PLAINTIFFS' Federally Registered Trademarks are Valid and Enforceable Under the Lanham Act

With respect to the first element for infringement, PLAINTIFFS own two federal registrations for both the Word Mark and Stylized Mark. These registrations are "conclusive evidence" of the validity of the mark, PLAINTIFFS' ownership of the mark, and of PLAINTIFFS' "exclusive right" to use the mark for books sold in United States commerce (5 U.S.C. §§ 1065, 1115(b); *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 106 (E.D.N.Y. 2012)  holding that "[i]ncontestable trademarks are "conclusive" evidence of the owner's exclusive right to use the mark"; *see also*: *CytoSport, Inc. v. Vital Pharmaceauticals, Inc*, (E.D. California 2009) 617 F. Supp. 2d at 1065 (registration proves plaintiff owns a valid mark – preliminary injunction granted)).

PLAINTIFFS also own a common law trademark in the Word Mark and Stylized Mark for romance novels, and specifically, romance novels which constitute a "book series." PLAINTIFFS and its retailers (including Amazon.com) have consistently used the Word Mark and Stylized Mark to advertise, promote and sell HOPKINS' romance novels.  Neither the Word Mark nor Stylized Mark are descriptive of the content of the books they are associated with and thus are inherently distinctive, and as a series have acquired secondary meaning and immediately

protectable by virtue of HOPKINS' use of the both in commerce for the sale of romance novels, and specifically a series of romance novels.

In addition, "[a] design used in conjunction with other marks is separately protectable in its own right if it creates a separate and distinct impression from the impression created by the other marks. This will be true if either the mark is itself inherently distinctive, or if the consuming public has come to associate the separate mark in itself with the particular product, vesting it with its own distinct secondary meaning, *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005) (*citations omitted*).

### B.   PLAINTIFFS' Federally Registered Trademarks are Valid and Enforceable Under New York Common Law

As is set forth herein, under New York common law, Defendants WATSON and CRESCENT have been, intend to, and are, using false descriptions or representations concerning the source of their books, which is likely to cause confusion, mistake or deception about the origin, source or sponsorship of HOPKINS' novels.

### 1.   Defendants Infringing Marks Cause a Likelihood of Confusion With PLAINTIFFS' Federally Registered Trademarks

The Defendants respective infringement creates a likelihood of confusion with the PLAINTIFFS and the Federally Registered Trademarks.  While "[e]vidence of actual confusion is not required to prove the likelihood of confusion,"[6] *Centaur Commcations, supra,* at 1227, (citing: *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, *supra*; *quoting*: *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, *supra*). In this matter the PLAINTIFFS provide actual proof of confusion by way of communications from PLAINTIFFS' consumers evidencing such confusion (attached to the Verified Complaint as **Exhibit "P"**).

---

[6] See also: *Lois Sportswear*, 799 F.2d at 875 ("actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove, and the Act requires only a likelihood of confusion as to source").

"The likelihood of confusion analysis is typically guided by the eight factor balancing test set forth in *Polaroid*…" *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 584 (S.D.N.Y. 2015).

"It is axiomatic in trademark law that 'side-by-side' comparison [of the marks] is not the test," *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980); *this Circuit*: *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 552 (S.D.N.Y. 1996). Rather, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone," Id. at 334. (*see also*: *Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd*, 2006 WL 1214859 (N.D. Ca 2006), at 3 (BLACK CHICKEN and THE BLACK CHOOK for wines are confusingly similar) "The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar with the one party's mark, is presented with the other party's goods alone," (*quoting*: *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 466 (N.D. Cal. 1991)).

In *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004), the Court held:

> "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source…Nonetheless, it has been noted that: There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." (*citation omitted*)

In addition, in analyzing confusion, the Court should look to both the "likelihood of consumer confusion and potential loss…both in terms of sales and reputation" U.S. *Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

In the case at bar, not only is there evidence of actual confusion, but by the mere side-by-side comparison, it is clear why such confusion would take place, there has been substantial harm to the reputation of the Plaintiff.

### a.    The Infringing Marks are Substantially Identical

"Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion," *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).  Similarity of the marks is determined by considering the marks "in their entirety and as they appear in the marketplace," and are "adjudged in terms of appearance, sound, and meaning." *Id.* Similarities between the marks are "weighed more heavily than differences." *Id.* In addition, where, as here, the parties' goods are identical, less similarity is required between the marks for this factor to favor plaintiff, *PowerFood, Inc. v. Sports Sci. Inst.*, C-93-0259 MHP, 1993 WL 13681782, at 6 (N.D. Cal. Mar. 11, 1993).

"The comparison of marks is an inquiry designed to determine the general impression conveyed to the purchasing public by the respective marks," *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 76 (2d Cir. 1988) at 77 (*internal quotation marks omitted; quoting*: *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir. 1985)).

In this matter, taking the marks side by side, we find that they are all substantially similar, and that the Infringing Marks would clearly give the impression that they originated from works created by the Plaintiff, or which belonged together with her previously published series of novels.

"Dilution by blurring occurs where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will

lose its ability to serve as a unique identifier of the plaintiff's product," *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 562 (S.D.N.Y. 1996).

### b.      The Goods are Identical

To the extent that the Infringing marks are being used on books, the goods in commerce are identical. To the extent that the CRESCENT has used her mark to identify a romance novel in a book series, the level of identicality is compounded.

### c.      The Trade Channels in Commerce are Identical

"Convergent marketing channels increase the likelihood of confusion." *CytoSport, Inc. v. Vital Pharmaceauticals, Inc*, (E.D. California 2009) 617 F. Supp. 2d at 1069 (*internal quotation marks removed*; *quoting*: *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979)). The key inquiry under this factor is whether consumers are likely to encounter the parties' goods in the same or similar retail outlets, regardless of what methods the parties used to get their goods to those outlets (*see*: *Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105 (D.N.H. 2003) at 119  ("There is no evidence that beer consumers would know or care whether products for sale at a retail outlet came from different distributors.")).

PLAINTIFFS sell their novels online in the most recognizable book market in the world: Amazon.com. Defendants products are sold in the exact same market, to the exact same consumers.

Moreover, the proximity of the use of the Federally Registered Trade Marks, and the use of the Infringing Marks by CRESCENT and WATSON, is exact, as the products are entirely complimentary, sold to the same class of purchasers, and similar in use and function.

### d.      PLAINTIFFS' Word Mark and Stylized Mark are Strong

Where the parties' marks and goods are highly similar, the strength of plaintiff's mark is relatively unimportant, *Brookfield Communications*, *supra* at 1059. Nevertheless, the stronger a trademark, meaning the more likely it is to be remembered and associated in the public mind with the mark's owner, the greater the protection it is accorded by the trademark laws, *Id.*

A mark's strength "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Estee Lauder*, *supra* at 1510.

The strength of a mark depends upon both its "conceptual" strength (i.e., whether the mark is categorized as generic, descriptive, suggestive, or arbitrary) and strength "in its commercial context." *Centaur Communications, supra*, at 1221 (*citations omitted*).

The conceptual strength of a mark can be classified "[f]rom weakest to strongest . . . as generic, descriptive, suggestive, and arbitrary or fanciful." *GoTo.com, Inc., supra* at 1199. PLAINTIFFS' marks are arbitrary because "Cocky" does not describe or suggest the nature or character of HOPKINS' series of novels. Thus, PLAINTIFFS' marks are conceptually strong – a fact that, when combined with the similarity of Defendant Infringing Marks to PLAINTIFFS' strong marks – "weighs heavily" in favor of a likelihood of confusion, *In re Majestic Distilling Co.*, Inc., 315 F.3d 1311, 1315 (Fed. Cir. 2003).

Additionally, as in *Centaur Commcations, supra*, at 1221 (*citations* omitted), there is also persuasive evidence of the mark's strength in its commercial context, including significant identification by the public and significant sales.

Finally, and most importantly, the Federally Registered Trademarks are associated with a series of no less than nineteen (19) novels, each bearing the Federally Registered Trademarks.

> **e.   Romance Novel Series Consumers Do Not Exercise a High
> Degree of Care**

Unsophisticated consumers aggravate the likelihood of confusion, *Hasbro*, *supra.*

This is especially true when the competing products' marks are similar, and the products are in competitive proximity, *Id.*

In this matter, it is respectfully submitted that books are often impulse purchases based upon a publication's cover or title. Bare-chested muscular males and extremely attractive females traverses across the covers of many romance novels. The PLAINTIFFS' Marks distinguish those common elements with a word and a style which is unique and permits her novels to be easily identified as written by her. Moreover, there is no particular consumer sophistication attached to likely purchasers of the books at issue, which are geared to a wide segment of the American public.

## f.     Defendants' Use of the Infringing Marks is in Bad Faith

Proof of Defendant's bad faith use of the mark is unnecessary to win a preliminary injunction (*see: Synergistic Intern. Inc. v. Windshield Doctor, Inc.*, 2003 WL 21468568 at 7 (granting a preliminary injunction despite no evidence of bad faith). This is because "[t]he lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield*, *supra* at 1059).

Nevertheless, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived," *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979). In other words, if the court finds that the defendant used its mark in bad faith, it can presume a likelihood of confusion (*e.g., Academy of Motion Picture Arts & Sciences v. Creative House Promos.*, Inc., 944 F.2d 1446, 1456 (9th Cir. 1991) ("[W]here evidence shows that one company deliberately adopted another's name to obtain advantage from the other's good will, we may infer a likelihood of confusion.")).

Cocktales is to be a collection of short stories, which will repeatedly use the word "cocky," and whose content (we can clearly assume[7]) is intended to smear, by association, the reputation of the PLAINTIFFS.  Organized by the WATSON (and others), it includes lists a who's-who of best-selling novelists[8], who are have all joined this vicious cause.[9]

As further set forth in HOPKINS' Affidavit, various social media campaigns have resulted in a significant decline in her novel sales, as well as a corresponding loss of income, significant and permanent damage to her reputation, as well as emotional distress. In a country governed by the rule of law, these civil-law-breaking-in-your-face-protests should not be tolerated. WATSON (and the totality of related supporters) could have easily banded together and sought to operate within the system of justice, which was established for them at the founding of this country. Therein, they could have attempted to support their legal positions[10] with substantive facts and the applicable law. Instead, like a pack of blood-thirsty wolves, they sought to create various means with which they have, and intend to, dilute the PLAINTIFFS' federally registered and approved trademarks. Thereby destroying her reputation and future earning potential, and by doing so evidencing a high degree of bad faith.

Plaintiff accordingly submits that she will be irreparably harmed if the Defendants are permitted to continue this course of action, and that they should be immediately enjoined from organizing and publishing Cocktales. In addition, Plaintiff respectfully submits that the intention

---

[7] If this is not the case, then WATSON can easily provide a copy of the content prior to publication.

[8] For the purposes of judicial economy, the Plaintiff names only the main organizer of this "anthology," with the hope that the other participants will be significantly deterred by any future order of this Court.

[9] The vicious nature of this cause is clearly exemplified by the fact that the "anthology" was organized via a secret email list, access to which was governed by an application process (see **Exhibit "O"** attached to the Verified Complaint).

[10] Which are, respectfully, meritless.

to publish Cocktales with the Word Mark and the Stylized Mark in the title of Cocktales is sufficient grounds for such relief, in and of itself.

As set forth above, CRESCENT published two books with the same word mark, substantially stylized as the PLAINTIFFS' Word Mark, in the romance novel genre, and has gone so far as to call her novels "The *Cocky Series* Book" (*emphasis added*; see **Exhibits "K"** and **"L"** attached to the Verified Complaint). Respectfully, this is substantial evidence of bad faith.

### g.    There is Actual Confusion in the Market Place

"Poof of instances of actual confusion of buyers may suffice either to prove the existence of secondary meaning or may itself be sufficient to warrant judicial relief without even considering secondary meaning." 2, 3 McCarthy, Trademark and Unfair Competition § 15.04[4][b]; § 23.02[1] (4th ed. 1997) or under New York common law: *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.* 42 N.Y.2d 538, 543, 399 N.Y.S. 2d 628, 369 N.E. 2d 1162 (1977)).

As is set forth by the HOPKINS Affidavit submitted with her motion, she has received communications indicating that her readers (new and old) have been actually confused by the use of the Infringing Marks in the market place (attached to the Verified Complaint as Exhibit "P").

### I.    The Trademark Infringement Irreparably Injures PLAINTIFFS

Irreparable injury exits where "recognition is lost, the term is rendered generic, trademark status is impaired, and the value of the trademark owner's rights is lost or diminished, *Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978).

PLAINTIFFS will continue to suffer irreparable harm due to the intentional infringement if Defendant is not preliminarily enjoined from using the Word Mark, Stylized Mark and

all similar marks.

PLAINTIFFS have spent substantial resources building and carefully cultivating the "cocky" series of romance novels. PLAINTIFFS are relying on that reputation to support the continued and expanded public desire for its romance novels. That reputation is being tarnished by the production of other novels and books which negatively impact the reputation of HOPKINS (see: *Starbucks Corp. v. Heller*, CV 14-01383 MMM MRWX, 2014 WL 6685662, at 9 (C.D. Cal. Nov. 26, 2014) (loss of control over quality of goods under the marks constitutes irreparable harm); *Kalologie Fran. LLC v. Kalologie Skincare Med. Group of California*, CV 14-00016 DDP VBKX, 2014 WL 953442, at 5 (C.D. Cal. Mar. 11, 2014) ("A plaintiff's loss of control over its business reputation resulting from a defendant's alleged unauthorized use of its protected mark during the pendency of an infringement action can constitute irreparable harm justifying injunctive relief.").

## II.     The Balance of Hardships Weights Heavily in Favor of PLAINTIFFS

A court must consider the balance of hardships between the plaintiff 146 and defendant and issue [an] injunction only if the balance of hardships tips in the plaintiff's favor," *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 145–46 (E.D.N.Y. 2011) (*citation omitted*).

PLAINTIFFS have proven an overwhelming likelihood of success on their claims (*see supra*: Section I). PLAINTIFFS are suffering overwhelming and substantial irreparable Injury (*see supra*: Section II). Any potential harm to WATSON and CRESCENT that may result from being preliminarily enjoined from infringing PLAINTIFFS' Marks – an unlawful activity– is legally irrelevant in light of PLAINTIFFS' overwhelming likelihood of success on the merits and the massive irreparable harm caused to PLAINTIFFS by the conduct of Defendants WATSON and CRESCENT (*see*: *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330,

1338 (9th Cir. 1995) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."); *Cadence Design Systems v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (holding that it was reversible error for a district court to consider "the fact that an injunction would be devastating to [defendant's] business" because "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration" (*internal citation omitted*).

With regard to the use of the Infringing Marks, CRESCENT has at least two novels in publication.  The publication of each is recent and post-dates the use of the Federally Registered Trademarks by the PLAINTIFFS.  CRESCENT will suffer little or no harm in renaming the book or changing its cover at this time. Conversely, the PLAINTIFFS currently have nineteen (19) novels in publication using the Federally Registered Trademarks.

The WATSON is using the Infringing Marks to promote a *single* book which is intentionally being used as a means of protest. That book has not yet been published. Defendant WATSON will suffer no harm in renaming the book or changing its cover at this time.

### III.   The KNEUPPER Petition to Cancel the Word Mark Should Be Dismissed with Prejudice

On the basis of the above, and the reasons set forth hereinafter, the Petition of KNEUPPER is entirely without merit.

KNEUPPER submits in his Petition (at ¶ 8) that it is somehow significant that the word "'cocky' covers only a portion of the title to the series at issue." And that this invalidates the mark as it does not create a "commercial impression." This argument is entirely without merit. In KNEUPPER'S world, incorporation of the "Star Wars" trademark in to a title (i.e. "Star Wars:

The Force Awakens") would vitiate protection. Using that logic, a romance novel using the "Star Wars" trademark would also not be an infringing use (e.g.: "Star Wars: The Love Awakens").

KNEUPPER further submits in his Petition (at ¶ 9-10) that the word "cocky" "as used in the title to a romance novel cannot be trademarked because it is generic and descriptive…[and] a mere adjective." In support of this position, KNEUPPER cites *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F. 2d 296 55, A.L.R. Fed. 223 (1979) (Petition at ¶ 11)*.* In that case, the Court held that "[i]n order to be 'generic,' the name MONOPOLY, in the minds of the consuming public, must primarily denote product rather than source." In his Petition, KNEUPPER fails to submit any probative evidence that the name "cocky," in the minds of the consuming public, denotes (in this case) all romance novels in a series, and not (instead) the source of the actual books, which in this matter would be HOPKINS. In other words, KNEUPPER has alleged (quite comically) that all romance novels are also known by the consuming public as "cocky" (or perhaps he would like us to call them "cockies?"). In rebuttal, the Plaintiff submits that she is aware of specific instances where there was actual confusion between her "cocky" novel series, and the subsequently published books of the CRESCENT.  In those instances, it was the duplicative stylized use of the word "cocky," especially in the title of each series, which was used in a series format, which resulted in this confusion.

At ¶ 12 of his Petition, KNEUPPER submits that "[n]umerous romance novels have used 'cocky' in their…*series title*" (*emphasis added*). Alleged examples are cited at ¶ 13. KNEUPPER offers no proof that the dates he lists as the publication dates are, in fact, the actual dates of publication. Notwithstanding this shortcoming, none of the titles cited in support of this

position were published prior to the HOPKINS' use of "cocky" as a means of identifying her series.[11]

At ¶ 15, KNEUPPER, once again in a conclusory fashion, states that PLAINTIFFS cannot show that "the title to its series has been promoted or recognized as a mark." As is set forth in HOPKINS' Affidavit, she has had specific emails which predate her trademark applications which indicate that her customers were experiencing actual confusion from the use of "cocky" by other authors to describe their (subsequently published). In fact, the Defendant CRESCENT specifically used the Word Mark, and duplicated the Stylized Mark, and called it a "series,", in an attempt to deceive the public, and benefit from HOPKINS' reputation and those previously established marks. Which, as also set forth in HOPKINS' , was the specific reason she sought to register the marks in the first instance. Plaintiff submits that these facts, in and of themselves, establish conclusively that the Plaintiff has an actual need for trademark protection.

## CONCLUSION

For the reasons set forth above, PLAINTIFFS respectfully request that this Court grant PLAINTIFFS' Motion.

**Dated: May 25, 2018**
**Brooklyn, NY**

Respectfully submitted,
Cardillo Law, P.C.

By: Christopher Cardillo (7769)
*Attorney for Plaintiff Faleena Hopkins*
9728 3rd Avenue, Suite 308
Brooklyn, New York 11209
T. 646-398-5025
F. 646-365-8833
C. 347-309-0000
Email: cardilloesq@gmail.com

---

[11] In addition, one of the novels cited by KNEUPPER uses the word "cocky" as an adjective to describe the character of the book series in question, and not the series itself ("[he is] a cocky cage fighter").