```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   HOP HOP PRODUCTIONS, INC. and
     FALEENA HOPKINS,
 4
                     Plaintiffs,
 5
                  v.                          18 CV 4670 (AKH)
 6
     KEVIN KNEUPPER, TARA CRESCENT,
 7   and JENNIFER WATSON,
                                              Application for PI
 8                   Defendants.

 9   ------------------------------x
                                              New York, N.Y.
10                                            June 1, 2018
                                              11:30 a.m.
11   Before:

12           HON. ALVIN K. HELLERSTEIN

                                              District Judge
13

14

15
             APPEARANCES
16

17   CHRISTOPHER S. CARDILLO
     JONATHAN POLLACK
18        Attorneys for Plaintiffs

19   LEASON ELLIS LLP
          Attorneys for Defendant Kneupper
20   BY:  CAMERON S. REUBER
          LAUREN B. EMERSON
21
22   COWAN DEBAETS ABRAHAMS & SHEPHERD LLP
          Attorneys for Defendant Crescent
     BY:  ELEANOR M. LACKMAN
23        SCOTT J. SHOLDER

24   HUNTON ANDREWS KURTH LLP
          Attorneys for Defendant Watson
25   BY:  JEREMY S. BOCZKO
```

1          (Case called)

2          THE COURT:  I'll hear the jurisdictional issue first.

3          MR. CARDILLO:  Your Honor, for plaintiffs, we believe

4     we have jurisdiction based on two different issues.  First,

5     this Court has subject matter jurisdiction over --

6          THE COURT:  I'm not worried about that.  I don't think

7     they challenged subject matter jurisdiction.

8          MR. CARDILLO:  The issue with personal jurisdiction,

9     your Honor, as to Kneupper, Kneupper has filed a trademark

10    petition in the TTAB claiming that he has standing to file such

11    petition.  We don't believe he does.  In his petition he

12    states -- and this is relevant and I'll get to it in a

13    second -- that he is a publisher of romance novels.  That isn't

14    accurate, your Honor.  As far as we can tell, and he hasn't put

15    in an affidavit --

16         THE COURT:  We are talking about service of process,

17    right?  Have you served him?

18         MR. CARDILLO:  He has been served both by email and by

19    FedEx.

20         THE COURT:  But not personally?

21         MR. CARDILLO:  I wasn't directed to serve him

22    personally with the order, your Honor.

23         THE COURT:  That is the purpose of the TRO but it is

24    not the purpose of the lawsuit.  Anyway, I think under rule 65

25    I can go ahead even before a connection is formally filed.

1              MR. CARDILLO:  In terms of the service of the lawsuit,

2    your Honor, we don't have and we can't confirm the addresses of

3    the other two defendants.  We wanted to address that today in

4    court, your Honor.

5              THE COURT:  Rule 65 is conditional on notice and not

6    filing.  Notice is sufficiently made by email and ordinary

7    mail.  Who has not been served, Mr. Cardillo?

8              MR. CARDILLO:  We had served Ms. Watson at what we

9    believe is her address in Texas, but we have not had

10   confirmation on that.  Through a diligent investigation by my

11   office, we determined that it is probably her address, but we

12   are not a hundred percent sure.  We requested from Ms. Watson

13   before she was represented to confirm.  She never responded to

14   us.

15             THE COURT:  Her attorney is here, right?

16             MR. BOCZKO:  Your Honor, the address is not associated

17   with Ms. Watson.  She has never lived there or worked there.

18             THE COURT:  How did you get notice to be here?

19             MR. BOCZKO:  Plaintiffs' counsel sent an email to the

20   general email address of her business, and it was forwarded on

21   to her.

22             THE COURT:  She got it that way?

23             MR. BOCZKO:  Correct.

24             THE COURT:  So she has notice.

25             MR. BOCZKO:  Correct.

1      THE COURT:  We can proceed.  You will give the address

2  to Mr. Cardillo so he can make service proper if you don't want

3  to accept service.

4      MR. BOCZKO:  Yes, your Honor.

5      MR. CARDILLO:  For Ms. Crescent, your Honor, we have

6  been unable to ascertain that is her correct name.  We don't

7  believe it is.  We think it is an alias or pen name.  We also

8  have been unable to obtain her address even though she is

9  represented by counsel.  Prior to this case being filed,

10  counsel set a letter to Mr. Pollack, the trademark attorney

11  sitting to my left, stating that they represented her.  We

12  contacted that law office --

13      THE COURT:  Is the petition for cancellation made by

14  her?

15      MR. CARDILLO:  No.  The petition is made by Mr.

16  Kneupper, who is a California resident.

17      THE COURT:  What are you going to do about this?

18      MR. CARDILLO:  In terms of the service for Ms.

19  Crescent?

20      THE COURT:  Yes.

21      MR. CARDILLO:  I would like the Court to order the

22  same way you ordered Ms. Watson's attorney to give us the

23  information.  They are represented by counsel.

24      THE COURT:  Who represents them?

25      MR. CARDILLO:  Ms. Lackman and Mr. Sholder.

1          MS. LACKMAN:  Your Honor, we did have some discussions

2     regarding service, waiving service.  Our client is a Canadian

3     resident.  We are open to accepting service.  We had some

4     initial discussions.

5          THE COURT:  But you have notice?

6          MS. LACKMAN:  Correct.

7          THE COURT:  Provide the address for service of process

8     or accept service, one or the other.

9          MS. LACKMAN:  We will accept service.

10         THE COURT:  There you go.  That is an issue.  I think

11    we can go forward notwithstanding the arguments of lack of

12    service of process.  Now I'll hear you on the case, Mr.

13    Cardillo.

14         MR. CARDILLO:  Your Honor, we were forced to file this

15    order to show cause for three different reasons.  The first is

16    Ms. Crescent has published two books that are infringing on our

17    client's trademark that was duly filed with the USPTO.  I have

18    color examples of that.  It is pretty difficult to tell from

19    the black and white version in the document.  I also have a

20    board puts the four different books, two by my client and two

21    by Ms. Crescent, all together so you can see it is an

22    infringement of my client's trademark.  That is one reason.

23         The second reason is that the trademark registration

24    is a part of the complaint, and Ms. Kneupper filed what we

25    believe is an erroneous petition to cancel those trademarks.

```
 1          THE COURT:  I'm not going to stay proceedings before

 2   the evidence.  You go ahead.  Whoever wants to, go and do

 3   whatever you want to do there.  It is not my jurisdiction.  You

 4   go ahead.  I'm not staying.

 5          MR. CARDILLO:  Certainly, your Honor.

 6          THE COURT:  How could you bring in the person who

 7   filed it?

 8          MR. CARDILLO:  We believe because he filed a petition

 9   without standing.  In other words, he claims in his petition --

10          THE COURT:  That's a defense he makes there.  It is

11   not going to be a reason to bring in somebody else.

12          MR. CARDILLO:  Okay, your Honor.  We will withdraw

13   that as to Mr. Kneupper.

14          THE COURT:  Mr. Kneupper is out of the case.

15          MR. CARDILLO:  As to Ms. Watson, at the time there was

16   a secret -- and I don't use that in terms of my own wording but

17   in terms of what was put out by Ms. Watson -- there was a

18   secret movement called Cocktails which we believe also

19   infringed on our client's trademark.  Ms. Watson, as a

20   publicist we have learned for Cocktails, has engaged other

21   people and has requested that they infringe.

22          THE COURT:  So she has used your trademark?

23          MR. CARDILLO:  Yes.  Well, there is an issue of

24   whether or not she used our trademark once we were able to talk

25   to the attorneys.  I don't want to misrepresent it.  In the
```

sense that she is not the owner of Cocktails.  She is now,

according to her attorney and declaration, only the publicist.

However, as the publicist, she has clearly requested or

promoted the idea of infringing on our trademark by telling

people to write books with a "Cocky" title in it.

THE COURT:  After registration?

MR. CARDILLO:  After registration, your Honor.

THE COURT:  So she is in the case.

MR. CARDILLO:  She is in the case.

MR. BOCZKO:  May I respond?

THE COURT:  Yes.

MR. BOCZKO:  Ms. Watson has nothing to do with the

authorship, production, distribution.  She did not request

anything of anyone, and there is no evidence in the record that

suggests she requested anyone to write for the book.

THE COURT:  As a publicist, she has responsibility not

to infringe.  If this is a protectable mark, she infringed on

it.

MR. BOCZKO:  She simply would respond and reach out to

media who want to write about publication of the book.

THE COURT:  If she did anything like that, that is

potentially a misuse of the trademark.  She stays in the case.

Proceed, Mr. Cardillo.

MR. CARDILLO:  That was the original impetus for the

order to show cause, your Honor.  The complaint seeks a

1    declaratory judgment.  Let me take a step back.  We want a

2    declaratory judgment from this Court stating that the trade-

3    marks are valid and that our client has a right to them.

4            THE COURT:  As a matter of what?  Summary judgment?

5            MR. CARDILLO:  As a matter of summary judgment, yes,

6    your Honor.

7            THE COURT:  It's too early.  You're hear on a TRO or a

8    PI.

9            MR. CARDILLO:  It is least on the PI, your Honor.  We

10   would like to enjoin Ms. Crescent from continuing to publish

11   her books using our trademark.

12           THE COURT:  Start with the basic steps.  She is a

13   defendant.

14           MR. CARDILLO:  Yes.

15           THE COURT:  Either real or under a pseudonym.

16           MR. CARDILLO:  That's correct, your Honor.

17           THE COURT:  Mr. Reuber, who represents Tara?

18           MS. LACKMAN:  I do, your Honor, Ms. Lackman.  I

19   represent Ms. Crescent.

20           THE COURT:  I can make you reveal whether she is a

21   real person or a pseudonym.  You might as well just do it.

22           MS. LACKMAN:  It is a pseudonym.  "Tara Crescent" is a

23   pseudonym.  She has written a lot of books.  Two of her titles

24   are at issue in the case.  The others have never been alleged

25   to have anything to do with this.

1          THE COURT:  The real party in interest has to be sued.

2          MS. LACKMAN:  Correct.

3          THE COURT:  So, do you want to give us the name?

4          MS. LACKMAN:  Our concern is as a matter of equity

5   that suing a party who is, in our view, not liable for

6   infringement, there has not yet been any showing that this will

7   encourage other plaintiffs to file suit in order to unmask

8   them.

9          THE COURT:  Ms. Lackman, the first thing in discovery

10   will be to reveal her name.  You have no basis not to.

11          MS. LACKMAN:  Thank you, your Honor.  We would be

12   amenable to deferring discovery to the extent this case

13   proceeds.

14          THE COURT:  I can order discovery tomorrow.  I can

15   order a deposition of your client tomorrow.  Why are you

16   fencing with me?  If you don't want to publicize the name, give

17   it not to be used except for purposes of this case and under

18   seal.

19          MS. LACKMAN:  That would be what I would request, your

20   Honor, that we do it under seal.

21          THE COURT:  Work that out with the plaintiff, and I

22   will so order it.

23          MS. LACKMAN:  Thank you, your Honor.

24          THE COURT:  Assume now, Mr. Cardillo, that you have

25   the real party at interest.

```
1              MR. CARDILLO:  Thank you, your Honor.

2              THE COURT:  Proceed.

3              MR. CARDILLO:  Your Honor, in terms of Ms. Crescent,

4    if I may, I don't know if the Court likes to use these types of

5    exhibits or displays, but I have set up an exhibit that clearly

6    shows, and I can hand this up to the Court, that clearly shows

7    the four book covers.  Two are by Ms. Crescent:  Cocky Doctors

8    and "Cocky" Firefighters.  The others are two by my client.  My

9    client has 19 books in this series already.

10             THE COURT:  Have the defendants seen these pictures?

11             MR. CARDILLO:  They are part of the complaint but not

12   in color.  I have one that I can hand to the defendants in

13   color.

14             THE COURT:  Mark it as Exhibit 1 and hand it up.  Four

15   photographs.  Why don't we call them 1, 2, 3, and 4.  Tell us

16   which is which.

17             MR. CARDILLO:  Your Honor, number 1 would be Cocky

18   Roomie, a book authored by Ms. Hopkins.

19             Number 2 would be Cocky Firefighters, a book authored

20   by Ms. Crescent.

21             Number 3 would be Cocky Doctors, a book authored by

22   Ms. Crescent.

23             And number 4, would be Cocky Mothers Day, a book

24   authored by Ms. Hopkins.

25             Cocky Roomie was the first in the series.  Cocky
```

1  Mothers Day was in the last in the series so far of the 19

2  books.

3         THE COURT:  Are these all by the defendant?

4         MR. CARDILLO:  Two are by my client.  The reason I

5  lumped them together is because as you can see --

6         THE COURT:  Which two?  Faleena Hopkins?

7         MR. CARDILLO:  Faleena Hopkins is the Roomie and the

8  Mothers Day, the first and last in the series, Exhibit 1 and

9  number 19.

10         THE COURT:  Exhibit 1 is the alleged infringing and

11  Exhibit 4 is the alleged infringing.

12         MR. CARDILLO:  Exhibits 1 and 4 are the plaintiffs'

13  books.  Numbers 2 and 3 are the alleged infringing books.

14         THE COURT:  The way we marked it, Cocky Roomie is

15  Plaintiff's Exhibit 1, Cocky Mothers Day is Plaintiff's

16  Exhibit 4.

17         MR. CARDILLO:  Right.  Those are my client's books.

18  The other two books are the books written by Ms. Crescent.  As

19  you can tell, the font, the placing --

20         THE COURT:  2 and 3 are the defendant's books.

21         MR. CARDILLO:  Yes.  As you can tell, the font, the

22  placement of the word, the size of the word, the way it is laid

23  out on the book cover is almost identical, if not identical, to

24  what Ms. Hopkins does with her books.

25         THE COURT:  Let's look at the trademarks.  They are

1   Exhibit E to your declaration.  What is claimed is the word

2   "Cocky" as standard characters without claim to any particular

3   font, style, size, or color.

4         MR. CARDILLO:  Your Honor, that is correct.  But there

5   are two trademarks.  My client actually owns three trademarks.

6   If you look at Exhibit G, it is the second trademark, which is

7   stylized trademark of COCKY.

8         THE COURT:  Which came first?

9         MR. POLLACK:  Your Honor, they were both filed at the

10  same time.

11         THE COURT:  No, I want you to answer that.

12         MR. CARDILLO:  They were both filed at the same time,

13  your Honor.  The COCKY trademark, the stylized one, to my

14  understanding, was used a little bit later in the series in

15  terms of the style, the way it was written.  But the format of

16  the "Cocky" cover has been the same from the beginning.  In

17  other words, there has always been the word "Cocky" above the

18  other word in the center, large bold type, etc.

19         THE COURT:  You have also registered the word "Cocky"

20  as a series of downloadable ebooks in the field of romance.

21         MR. CARDILLO:  That's correct.

22         THE COURT:  That's F.

23         MR. CARDILLO:  To be clear, on Exhibit F there are two

24  classes, class 9 and class 16.  Class 9 is the series of

25  downloadable ebooks in the field of romance.  Class 16 is a

1    series of books in the field of romance.  We have registered in

2    both of those classes, your Honor, both of the trademarks, both

3    the stylized and the word.

4              THE COURT:  Exhibit G is the literal elements in a

5    script design.

6              MR. CARDILLO:  That is correct, your Honor.  That is

7    what you see on the covers of the two books that I have handed

8    up.

9              THE COURT:  How can you trademark the word "Cocky"?

10             MR. CARDILLO:  Your Honor, there are a few ways.  The

11   first thing is that in a series, the case law is very clear on

12   this, you can trademark words like "Cocky" without an issue.

13   Second is when you say the word "Cocky," you don't necessarily

14   think of anything that is relatable to the book except the book

15   itself.  So it identifies the book.  It is definitely a source

16   identifier in terms of what you think about.  Ms. Hopkins has

17   600,000 books sold so far.  So this is a community that is well

18   versed in her books and book covers and this trademark, even

19   before she filed it.

20             THE COURT:  Do defendants argue that there is any

21   relationship between the title "Cocky" and the contents of the

22   book?

23             MR. CARDILLO:  I don't believe they do, your Honor.

24   But that would be erroneous.  "Cocky" is a term used for this

25   book as a source identifier for the series.  That's the key.

1    The key is that this is a series.  We are looking to protect it

2    as a series in the same way that "Star Wars" was protected.

3              THE COURT:  If you can protect one, you can protect

4    the series.  If you can't protect one, the fact that it may be

5    a series doesn't help you.

6              MR. CARDILLO:  Your Honor, I'm not sure if I agree.

7              THE COURT:  Repetitive use.

8              MR. CARDILLO:  I'm not sure if I agree with that.  It

9    provides a pointing to the source.  If I want to buy another

10   book in that series and I see the word "Cocky," I understand

11   that now I'm buying a book in that series.  The same way if I

12   was buying a book in the Twilight series, which is copyrighted.

13             THE COURT:  In other words, you want to be able to

14   prove that there is a secondary meaning here because of the use

15   of the series?

16             MR. CARDILLO:  If the Court wanted me to do that, I

17   think I could do that.  But I don't think this requires

18   secondary use.  I think the case law clearly shows that it

19   doesn't, and I don't think "Cocky" is -- at the least it is

20   suggestive.  When you think of "Cocky," you don't think of a

21   romance novel.  You might think of a bar fighter, a prize

22   fighter, someone who has done very well in school.

23             THE COURT:  You think it is suggestive of male

24   prowess?

25             MR. CARDILLO:  I think it is suggestive of if you walk

1    through a few steps, you would get to a romance novel.  That is

2    what we are protecting here, the use of the word "Cocky" on the

3    cover of a romance novel.

4            THE COURT:  You said it is not descriptive of anything

5    or suggestive of anything.  It seems to me it is at least

6    suggestive of male prowess in a romantic situation.

7            MR. CARDILLO:  I would say at the least we are in the

8    suggestive category, which is worthy of trademark protection.

9            THE COURT:  All these books have to do with the

10    prowess of males?

11            MR. CARDILLO:  Yes.  But, more important, all these

12    books have to do with the Cocker family.  The first six books

13    were about the original six brothers.  The next set of books

14    were about their children.  So we follow the Cocker family.

15    They are known as "Cocky."  That's why "Cocky" is used in the

16    titles.  Also, the defense argues that Cocker is the name of

17    the series.  That is not the name of the series.

18            THE COURT:  That doesn't prove anything.  Anything

19    else you want me to say on the validity of the trademark?

20            MR. CARDILLO:  Not at this point, your Honor.  I just

21    want to respond to whatever the defense says.

22            THE COURT:  Let's turn it over to the defense on the

23    validity of the trademark.

24            MR. REUBER:  Cameron Reuber on behalf of all three

25    defendants.

```
 1              MR. CARDILLO:  Your Honor, may I interrupt for one
 2    second?  Mr. Reuber represents Mr. Kneupper, who is no longer
 3    in the case.
 4              THE COURT:  He is out of the case.
 5              MS. LACKMAN:  I don't know if he should be
 6    representing in court.  I'm happy to do it if it's a problem.
 7              THE COURT:  Ms. Lackman.
 8              MS. LACKMAN:  A couple of points.  One is with respect
 9    to the protectability of the mark and how strong it is.  The
10    fact is we have this in the record.  This is a commonly used
11    term.  They are by romance writers.  This is not something out
12    of thin air.  This is not Harry Potter or something like that.
13    The term "Cocky" has been used in connection with a series well
14    prior to the time Ms. Hopkins used it.
15              THE COURT:  It started out with Cocker Brothers.
16              MS. LACKMAN:  Exactly.  If you look at the books that
17    were marked, you can see certain indicators of source here.  I
18    see "Cocker Brothers" being used consistently, independently.
19    I also see Ms. Hopkins name.  The term "Cocky" is not used as
20    an indicator of source, nor should it be.  It describes the
21    books.  It describes the contents of the books, as do the books
22    written by my client, who clearly labels her books with her
23    name on top.  Everyone knows that they are not Ms. Hopkins'
24    books and who actually started using the terminology for books
25    prior to Ms. Hopkins.
```

1          The question of the validity here, I think it is

2     something that will be heavily fought, perhaps with a petition

3     to cancel.  But in terms of the strength, this is not the type

4     of thing that can be used to censor other authors, especially

5     those who have come before.

6          THE COURT:  It is clearly being used as a source,

7     isn't it, indicating a source for a series of books?

8          MS. LACKMAN:  As this shows, this does not show an

9     indicator of source.  If I look at this, I would not say COCKY

10    a trademark.  I would say "Cocky" is part of the title of this

11    series of books.  In fact, the titles change in every term.

12    The title of the book is not Mothers Day by Cocky or Mothers

13    Day originated by Cocky.  The title is Cocky Mothers Day or

14    Cocky Roomie.  The source is Faleena Hopkins, and it appears to

15    be two books in the series Cocker Brothers, which was

16    consistently used, and we don't challenge that.

17          So out of anything on these covers that shows an

18    indicator of source for Ms. Hopkins, it is her name, it is the

19    term Cocker Brothers, perhaps the series.  For Ms. Crescent, it

20    is her name and there are a series of titles.  Trademarks are

21    entitled to be used --

22          THE COURT:  You are arguing, looking at Exhibits 1 and

23    4, Cocky Roomie is an adjective.

24          MS. LACKMAN:  Correct.

25          THE COURT:  And Cocky Mothers Day is what?

1          MS. LACKMAN:  Cocky Mothers Day, "Cocky" describes the

2    contents of the book.  It is an adjective that is descriptive

3    of the book.

4          THE COURT:  I don't see that.  Let's talk about

5    Exhibit 4, Cocky Mothers Day.  There is no connection between

6    "Cocky" and "Mothers Day."

7          MS. LACKMAN:  There may very well be.  I haven't read

8    the book, your Honor.  But there is an impression or suggestion

9    here that based on the image that is shown, based on the genre,

10   Cocky Mothers Day refers to some event on Mothers Day or

11   relating to Mothers Day or mothers themselves that might

12   involve some male prowess.

13         When one comes to the store or goes on Amazon and says

14   I'd like to buy a romance novel, they look for I want to buy a

15   book by Faleena Hopkins, I want to buy a book in the Cocker

16   series.  When they see Cocky Mothers Day, that is the title of

17   the book.  Cocky Roomie is title of the book.

18         THE COURT:  Cocky Mothers Day is clearly not an

19   adjective.

20         MS. LACKMAN:  It is an adjective of the book.

21         THE COURT:  If it is, it is a nonsensical.

22         MS. LACKMAN:  It describes the contents of the book.

23   This is not to an average person what would identify the source

24   any more than "Mothers Day."  "Mothers Day" is not an

25   adjective, is not an indicator of source either.  Book titles

1   are inherently as a matter of law not protectable unless you

2   can show --

3          THE COURT:  Would you excuse me for five minutes.

4          (Recess)

5          THE COURT:  Please continue, Ms. Lackman.

6          MS. LACKMAN:  To wrap up the point of your Honor's

7   question, the titles have something to do with the content of

8   the book, and that is what matters here.

9          THE COURT:  What is the relationship?

10         MS. LACKMAN:  Exhibit 1 is about a cocky roomie, and

11   Exhibit 4 has something to do with there is a Mothers Day plot

12   or something along those lines, and it involves the assertion

13   of male prowess.

14         THE COURT:  I can see in number 1 it shows a male

15   stripped to his waste, a tattoo on his arm, defined biceps,

16   defined abdominal muscles, with a certain look of haughtiness.

17   It seems to me that the title here, Cocky Roomie, is a

18   description of the type of roommate this person is or this

19   person has.

20         As to Exhibit 4, Cocky Mothers Day, the depiction is

21   of a young man in an open collar sport shirt, various items of

22   what appear to be a watch and cosmetic jewelry on his wrist, in

23   a pose that also shows a certain haughtiness.  What this has to

24   do with Cocky Mothers Day is anybody's guess.

25         So the "Cocky" I think relates to the picture and is

1   descriptive of the picture, but it may not have any meaning in

2   relationship to Mothers Day.

3           MR. CARDILLO:  It may or may not, your Honor.  I

4   assume that the reader would want to buy the book and find out.

5   The real question here is, is this a valid indicator of source.

6           That also depends on a couple of other points, one of

7   which is she wasn't the prior user of this series of marks.

8   All of these books or a significant majority of the books that

9   are described that Ms. Hopkins wrote were not sold under or

10  used the term "Cocky."  Many people have used this term before.

11  In fact, my client's books predate Ms. Hopkins' first use of

12  the term.

13          My client is not claiming rights in the term "Cocky"

14  because, as shown in Exhibits 2 and 3, it is not a trademark.

15  It is designed to entice the potential buyer into buying the

16  book and reading the stories, and it sends a message as to what

17  the stories may be about, that they may involve some assertion

18  of male prowess or otherwise.  So this is not we've got a

19  couple of problems.  This is not a question of branding.

20          THE COURT:  You present in your papers about a dozen

21  instances of prior use of "Cocky" in a title: Bite Me Cocky; A

22  Little Bit Cocky; The Cocky Cowboy; Cocky Balls Boa, described

23  as an erotic parody; Cocky Cowboys; Cocky SWATS; Cocky: A

24  Stepbrother Romance; Cocky: A Cowboy Stepbrother Romance; and

25  so on.

1          MR. REUBER:  Your Honor, if I may?

2          THE COURT:  No.  You are out of the case.

3          MR. REUBER:  I understand, your Honor.  But I penned

4    the brief, and there is an error that my client alerted me to

5    this morning in the brief.  Specifically, it is first one you

6    just read, Bite Me Cocky, published in 2012.  He has learned

7    that that title may have changed as a result of the Cockygate

8    sort of disputes.  It might have been originally published as

9    Bite Me and not Bite Me Cocky. I just wanted to point that out.

10         THE COURT:  Originally Bite Me, then it became Bite Me

11   Cocky?

12         MR. REUBER:  Yes, your Honor.  That was our

13   understanding.

14         THE COURT:  What is the explanation for the change?

15         MR. REUBER:  As a protest, effectively.  That is our

16   best guess.

17         THE COURT:  In response to the protest, he added the

18   word "Cocky"?

19         MR. REUBER:  In response to Cockygate registrations,

20   yes, we believe the author added the word "Cocky" as a protest.

21   That is pure supposition on our part, your Honor.  We have only

22   been doing this for about 48 hours.

23         MR. CARDILLO:  Your Honor, since this started, the

24   Cockygate whole thing --

25         THE COURT:  I know about that, but it is really

1    irrelevant.

2            MR. CARDILLO:  The use of "Cocky" and the infringement

3    on my client's trademarks if the Court finds them to be

4    valid --

5            THE COURT:  Let's stick to the point.

6            MS. LACKMAN:  Your Honor, we are not aware that

7    anything else on this list is incorrect.  As your Honor will

8    see, these dates well predate the claimed date of first use

9    which we also submit is actually fraudulent.  But that is a

10   separate question.

11           THE COURT:  What is the nature of these books?

12           MR. CARDILLO:  The nature of my client's books, your

13   Honor, follows the family called the Cocker family through

14   their multiple generations and their love lives and family

15   life.

16           THE COURT:  They are five brothers?

17           MR. CARDILLO:  The original series is about six

18   brothers, the first six books.  Each one is dedicated to an

19   individual brother.  The next series is about their children.

20   It is all part of one series, but the next set of books is

21   about the first six brothers, their children.

22           THE COURT:  Cocky Roomie?

23           MR. CARDILLO:  It's one of the brothers.

24           THE COURT:  Cocky Mothers Day?

25           MR. CARDILLO:  Cocky Mothers Day, I believe, is my

1    client puts out holiday books about the characters.  Cocky

2    Mothers Day, Cocky Christmas, things like that.  Again, I think

3    you're right, your Honor, in your assessment that there is no

4    way to assume that "Cocky" would mean what it would typically

5    mean in that title.

6           By the way, to address Ms. Lackman's point about prior

7    titles, I would point out that none of them are series.  My

8    client's is a series, which according to trademark law is very

9    different than a one-off.  None of the one-offs she speaks

10   about has applied secondary meaning to give them trademark

11   rights, and none of those individuals are here to contest what

12   we are trying to do.

13          MS. LACKMAN:  Your Honor, it is not correct that there

14   was no series.  Putting aside the minimal relevance of that, it

15   is not correct that there was no series prior to what Ms.

16   Hopkins claimed is her series.  There was a Cocky Cage Fighter

17   series that came out well before Ms. Hopkins.

18          THE COURT:  What came out before?

19          MS. LACKMAN:  The Cocky Cage Fighter series, I

20   believe.  It came out in 2015.

21          MR. CARDILLO:  Your Honor, we wouldn't dispute that

22   you can use the word "Cocky" in the Cocky Cage Fighter as an

23   adjective.

24          THE COURT:  Case Fighter?

25          MR. CARDILLO:  Cage Fighter, where you are fighting in

24

a cage, a metal cage.  We wouldn't dispute that somebody can

use that.  That is not what our application is for.  Our

application is very specific to the way we use "Cocky."

        THE COURT:  It is one of the three applications has to

do with the series, the other two don't.

        MR. CARDILLO:  Yes.  Well, they all have to do with

whether or not we hold the trademark legitimately based on the

series.

        THE COURT:  Why is that?  You don't mention series

except in --

        MR. CARDILLO:  In the reply we have, your Honor, I go

into it in detail.  There are numerous examples, and I can give

them to you right now.  I believe the cites are in my reply

brief.  "Cherished Romance" has been afforded trademark,

"Silhouette Romance" has been afforded trademark.  The word

"Class" in terms of a magazine has been afforded a trademark.

        THE COURT:  There may be a different standard in the

patent law office than there is in court.

        MR. CARDILLO:  Okay.  In any case, your Honor, Cocky

Cage Fighter, we have no objection to that.  You can use it in

that sense as an adjective in a long sentence and it is not

used the way Ms. Crescent uses it, as a way to confuse the

public and to direct readers to her series instead of our

series.

        MS. LACKMAN:  Your Honor --

```
 1              THE COURT:  "Cocky" Roomie and what you said before --

 2              MR. CARDILLO:  Are you addressing that to me, your

 3     Honor?

 4              THE COURT:  Yes.

 5              MR. CARDILLO:  I'm not quite sure what you want me to

 6     address.

 7              THE COURT:  You said one of them was descriptive.  You

 8     admitted that one of them was descriptive.

 9              MR. CARDILLO:  No, your Honor, I have never admitted

10     any of them are descriptive.  I am saying that the book that

11     Ms. Lackman is citing, Cocky Cage Fighter, which has nothing to

12     do with my client, that is a descriptive use of the word

13     "Cocky" in a title.

14              THE COURT:  No less and no more than a Cocky

15     Firefighter -- I'm sorry -- Cocky Roomie.

16              I'm looking back at your trademark registrations.

17     There is nothing about a series in Exhibit G and there is

18     nothing about a series in Exhibit F.

19              MR. CARDILLO:  I believe the trademark applications

20     include numerous book covers that shows that there is a series.

21              THE COURT:  I'm looking at what it says.  "The mark

22     consists of the literal elements in a script design."  That's

23     Exhibit G.  Exhibit F says --

24              MR. CARDILLO:  If you look at the class that it's in,

25     your Honor, both class 9 and 16, on the registrations, it
```

26

16clahom

1    actually says class 9 a series of downloadable, class 16 a

2    series of books.  It is actually given as a series.

3           THE COURT:  Exhibit E says, "The mark consists of

4    standard characters without claim to any particular font,

5    style, size, or color."

6           MR. CARDILLO:  That is correct, your Honor.  That

7    describes the actual mark.  But in terms of what the class we

8    applied for, they are both a series of books, whether they are

9    ebooks or the traditional printed book.  So we did apply for a

10   series, and that's what we are trying to protect.

11          THE COURT:  I want to move on to another point.

12          MS. LACKMAN:  Your Honor, if I may?

13          THE COURT:  No.  I'm looking at the <u>Polaroid</u> factors,

14   of which there are eight, which measure likelihood of

15   confusion.  That is the ultimate issue in this.  The first is

16   the strength of the plaintiffs' mark.  It seems to me at this

17   stage in the litigation that it is a weak mark at best.

18          The next factor is the similarity of plaintiffs' and

19   defendant's marks.  In looking at Exhibits 2 and 3, Ms.

20   Lackman, what is the trademark?

21          MS. LACKMAN:  My client's trademarks, if there are

22   any, on her books are her name, and that is pretty much it.

23   What I'm hearing from Mr. Cardillo is that he says there is no

24   issue with the series of books called Cocky Cage Fighters, but

25   my client can't put out a book called her Cocky Firefighters.

1   These are titles.  These are not trademarks.

2          THE COURT:  What is in the content of her Cocky

3   Firefighters?

4          MS. LACKMAN:  It appears to be a male-female-male

5   romance.  Beyond that, I imagine it involves one or two of the

6   male characters is a firefighter.

7          THE COURT:  In other words, it's descriptive of the

8   contents?

9          MS. LACKMAN:  Absolutely.

10          THE COURT:  Cocky Doctors?

11          MS. LACKMAN:  Same thing, yes.  Same with all the

12   other books that we put before your Honor.

13          THE COURT:  Two male figures.  One seems to be wearing

14   a stethoscope, indicating he is a doctor, but he is stripped to

15   the waist.

16          MS. LACKMAN:  Doesn't look like my doctor, your Honor.

17          THE COURT:  Another one also has a stethoscope, and he

18   is also stripped to the waist, maybe below the waist, with a

19   heavily tattooed arm.  These are descriptive of a certain kind

20   of doctor who is not necessarily a doctor but somebody

21   suggestive of male prowess.

22          MS. LACKMAN:  Correct, your Honor.

23          THE COURT:  Do you want to tell me something, Mr.

24   Boczko?

25          MR. BOCZKO:  Yes, please, your Honor.  I wanted to

1    point out that Ms. Watson's book that she is associated with

2    presents an entirely different issue.  On the similarities of

3    the mark, I hope we have an opportunity to discuss that.  Her

4    work is entirely different.  It was created by the Romantic

5    Authors Group.

6              THE COURT:  Who is that?

7              MR. BOCZKO:  This is the Cocky Collective.  Ms. Watson

8    is an unpaid publicist doing this as a courtesy.

9              THE COURT:  Who do you represent again?

10             MR. BOCZKO:  I represent Ms. Watson, Jennifer Watson.

11   As I mentioned to the Court previously, Ms. Watson is a

12   publicist.  She was asked by a group of authors who represent a

13   very large group of the romance novel community who were very

14   upset that the plaintiffs thought that they could monopolize

15   the word "cocky" or "arrogant" or "haughty" in book titles.  So

16   as a form of protest and to critique plaintiffs' attempt to

17   monopolize that mark, they came out with an anthology called

18   The Cocky Collective.  Plaintiffs have sort of cut off the

19   cover of the title, but it features a rooster.

20             THE COURT:  Where is that?

21             MR. BOCZKO:  Your Honor, we have a copy of the book.

22   But I have printouts if you as well.

23             THE COURT:  I never saw your papers because they were

24   online.  I didn't see them online.  You were supposed to

25   deliver a courtesy copy and none came.

1         MR. BOCZKO:  Correct, your Honor.  It was my under-

2  standing that there was an issue with delivery to the Court.

3  But we do have copies for the Court if we can present them to

4  your Honor.

5         THE COURT:  Please.

6         MR. CARDILLO:  Your Honor, while he does that, may

7  I --

8         THE COURT:  Let me see the exhibit.

9         MR. CARDILLO:  I wanted to speak to what Ms. Lackman

10  said and the two book covers.

11         THE COURT:  Let's finish with this.

12         MR. BOCZKO:  Also, your Honor, the book is called

13  Cocktails: the Cocky Anthology, and it features a rooster or a

14  cock on the cover.  Here are the papers for your Honor.  It was

15  intended as a form of protest and parody of their attempt to

16  monopolize that.

17         THE COURT:  I am not going to keep the book.

18         MR. BOCZKO:  That's quite all right.

19         THE COURT:  I'll consider the title.  Do you have a

20  color picture of the title?

21         MR. BOCZKO:  Yes, your Honor.  On the pages that I

22  printed out, that should be on your Honor's desk there.  From

23  Amazon, it features the full title and cover.

24         THE COURT:  What you are telling me is that if COCKY

25  is a valid trademark, then this is a deliberate infringement.

1          MR. BOCZKO:  This is a deliberate parody, your Honor.

2          THE COURT:  Just a minute.  The cover Cocktail is The

3    Cocky Collection will be marked as Exhibit A.

4          MR. BOCZKO:  This is a deliberate parody, your Honor,

5    an attempt to protest.  In fact, the foreword points that out

6    by one of the authors.

7          THE COURT:  What other things have you given me?

8          MR. BOCZKO:  That was simply a color printout so you

9    have the title.

10         THE COURT:  But it was in connection with a lot of

11   other things: customer reviews --

12         MR. BOCZKO:  It's just a complete printout, your

13   Honor.  I'm sorry.  I have only been 48 hours on this case.  I

14   would like to point out Ms. Watson was approached by this group

15   of authors.  All the proceeds are being donated, I believe.

16   Plaintiffs' counsel is trying to point out that they are paying

17   for my client's fees.  That is inaccurate.  No one has notified

18   my client that they are paying for her legal fees.  She has

19   provided me with a retainer.

20         Like I said, this group of authors and the writing

21   itself was outrage by the plaintiff's --

22         THE COURT:  I heard you.

23         MR. BOCZKO:  Thank you, your Honor.

24         THE COURT:  Do you want to respond?

25         MR. CARDILLO:  I want to respond to Ms. Lackman, and

1    then I will respond to the other opposing counsel.  Your Honor,

2    it is important to know that Ms. Crescent had worked with my

3    client prior to publishing these two books.  For her to say

4    that she wasn't aware of my client's use of the word "Cocky" in

5    her titles the way it is used, even prior to the application

6    for a trademark, is absolute nonsense.

7              THE COURT:  The second factor in the <u>Polaroid</u> factors

8    is a similarity of plaintiffs' and defendant's marks.

9              MR. CARDILLO:  They are identical.  I'm sorry, your

10   Honor.

11             THE COURT:  They are similar.

12             The third factor is the competitive proximity of their

13   products.  They are proximate and they are competitive.

14             Fourth is the likelihood that plaintiff will bridge

15   the gap and offer a product like defendant's.  Plaintiff is

16   making these books with these titles and defendant is

17   publishing the same, whether it is protest or as an original

18   offer.  It is another factor in favor of plaintiff.

19             Fifth is the actual confusion between products.  Mr.

20   Cardillo, you have one example of actual confusion.

21             MR. CARDILLO:  I have three examples.  It is the last

22   exhibit to my complaint, your Honor.  It is three emails or

23   correspondence.  I don't know if they are text messages or some

24   other type of correspondence with my client.

25             THE COURT:  Where is it?

1          MR. CARDILLO:  It is the last exhibit, your Honor,

2    Exhibit P.  There are three different pages.  Each one

3    represents a different communication to the author Ms. Hopkins,

4    telling her how these consumers were confused, bought the wrong

5    book, and were misled by the titles.

6          THE COURT:  What is the source of this?

7          MR. CARDILLO:  These are consumers, your Honor.  These

8    are pictures of actual communications between them and my

9    client, who is the author.

10          THE COURT:  How do I know that?  There is no address.

11          MR. CARDILLO:  I believe they are pictures from her

12    phone of the communications.  I can certainly aver to the fact

13    that they are legitimate.

14          On the first page, the third line reads, "I assume the

15    book was part of the series and didn't look further that the

16    authors were different."

17          The second page, "I'm so sorry I shared the link for

18    Cocky Chef.  You're right, the reason I read it was due to your

19    hard work.  So sorry."

20          The third page.  "Hi, Faleena.  I just figured out how

21    to return the book because the book wasn't her book, it was

22    somebody else using her trademark."

23          Your Honor, there is ample confusion in the community

24    of the romance purchaser, but in general.

25          THE COURT:  How do you answer that, Mr. Boczko.

1          MR. BOCZKO:  None of these instances of confusion

2     actually relate to Ms. Watson's books.  She is associated with

3     Cocktails.  I'm not sure what book they are being confused by.

4          THE COURT:  Ms. Watson is the publicist.

5          MR. BOCZKO:  For Cocktails.

6          THE COURT:  Let me hear Ms. Lackman.

7          MS. LACKMAN:  Admittedly Cocky Chef is not my client's

8     book.  None of these instances relate to my client's books.

9     And it is not even clear what these people were confused about,

10    three instances.  We are talking about purportedly tens of

11    thousands of books.

12         THE COURT:  If it relates to someone else has

13    published a book with the title "Cocky" in it?

14         MS. LACKMAN:  That party is not here.

15         THE COURT:  Mr. Cardillo, how do we know that this

16    refers to defendant's books?

17         MR. CARDILLO:  Your Honor, I can't represent to the

18    Court that we can make that connection with these three.  The

19    reason why Exhibit P is important is that other authors, as we

20    investigate this, are doing the same thing that Ms. Crescent is

21    doing: using the font, using the way it's placed, using the

22    size.

23         THE COURT:  But they are not in the case.

24         MR. CARDILLO:  They are not in the case, your Honor,

25    that's correct.

1    THE COURT:  I can't credit this as indicating actual

2    confusion.  The other instance that is mentioned is a reference

3    on a web page or a criticism.  It's unreliable.  No one knows

4    who placed it.  No one knows who sent it, nor the purpose.  So

5    I can't find that there are instances of actual confusion.

6    Defendant's good faith.  It seems to me, and I speak

7    to Ms. Lackman and Mr. Boczko, that there is a lack of good

8    faith.  The titles and the layout have a lot of similarity.

9    The issue really is whether they had a right to do that.

10    MS. LACKMAN:  Your Honor, I respectfully disagree.

11    The layouts are consistent with all sorts of romance novels.  I

12    don't know how my client could have acted in bad faith if she

13    used the term before Ms. Hopkins did.  If anyone acted in bad

14    faith --

15    THE COURT:  Where is this example of prior use?

16    MS. LACKMAN:  Our book came out in August 2017, and

17    the first time Hopkins used her mark as a series -- she used

18    Cocker Brothers consistently.

19    THE COURT:  We are not interested in Cocker Brothers.

20    MS. LACKMAN:  Right.

21    THE COURT:  What is the first instance of plaintiffs'

22    use of the word "Cocky"?

23    MS. LACKMAN:  November 18, 2017 is the first time she

24    used the term "Cocky" and claimed that it was a trademark.

25    THE COURT:  Is that right, Mr. Cardillo?

1            MR. CARDILLO:  That is incorrect, your Honor.  The

2      trademark came after her use, but the use of "Cocky" as you see

3      it in those papers that I preserved you with color photographs

4      of the books dates back to 2016, your Honor.  It is in my

5      papers the exact date.  I don't have it here.  June of '16.

6            THE COURT:  That is the reference in the registration,

7      right, Mr. Cardillo?

8            MR. CARDILLO:  That is correct, your Honor.

9            MS. LACKMAN:  Basically, all the people who came

10     before Ms. Hopkins, if my client thought it was okay to use

11     this term because all these other writers had been using this

12     term consistently since well before Ms. Hopkins claimed first

13     date of use in 2016 --

14            THE COURT:  All of this evidence of publicity and

15     marshaling of other writers in the genre to use "Cocky" on

16     their books is indicating lack of good faith.

17            MS. LACKMAN:  My client is separate.  My client is

18     just an author.  She is not agitating anybody or anything.  In

19     fact, she had a conversation with Ms. Hopkins and she said no,

20     it's okay if you use "Cocky." In fact, Mr. Cardillo said it's

21     okay if I use "Cocky" as long as you don't use Cocky

22     Firefighters.  You can use Cocky Cage Fighters.  This is where

23     this is all confusing.

24            THE COURT:  Exhibits 2 and 3, which are evidence of

25     your client's use, Exhibit 2 the title is her Cocky

1  Firefighters, "Cocky" in yellow and the other words in white.

2  It is subtitled "An MFM Menage Romance," showing two males and

3  a female.

4       Exhibit 3, the title is Her Cocky Doctors, also "An

5  MFM Menage Romance."  There too we see two males and a female.

6       MS. LACKMAN:  Correct.  Your Honor, my client's name

7  is prominently shown.  The others show a single male and the

8  term "Cocker Brothers."  What we have here is not the fact that

9  you run to the Trademark Office and you secure a trademark on a

10  dubious or nondubious basis.

11       THE COURT:  The most prominent aspect of these titles,

12  as you point out, Ms. Hopkins, is the name of the author.

13       MS. LACKMAN:  That's correct.

14       THE COURT:  Tara Crescent.  Let me hear Mr. Cardillo.

15       MR. CARDILLO:  Your Honor, in terms of bad faith, Ms.

16  Crescent knew about these books, knew what they looked like,

17  was helping promote them for Ms. Hopkins, never had a title

18  that looked like this before.  Once she saw the success of Ms.

19  Hopkins, all of a sudden created a Cocky series which she

20  promotes the series the same way my client does.  She calls it

21  the Cocky Series.  She takes the script, font, and look of --

22       THE COURT:  Where is that?  I'd like to see that.

23       MR. CARDILLO:  The Cocky Series is -- I might have it

24  in my papers, your Honor.  But there is proof in my papers, in

25  the complaint.

1          THE COURT:  Point me to it.

2          MR. CARDILLO:  Exhibit M shows that she had worked

3    with Ms. Hopkins in promoting --

4          THE COURT:  Exhibit M to the complaint?

5          MR. CARDILLO:  To the complaint, your Honor.  She had

6    worked with Ms. Hopkins to promote the Cocky Series books.  And

7    after that, after that exhibit, she then, understanding that

8    this is --

9          THE COURT:  Just a moment.  I want to see the exhibit.

10         MR. CARDILLO:  Sure.

11         THE COURT:  What is Exhibit M?

12         MR. CARDILLO:  Exhibit M is correspondence dated March

13   9, 2017, predating Ms. Crescent's two books that she published,

14   indicating that her and Ms. Hopkins were discussing cross-

15   pollinating their books with their followers.  In other words,

16   Ms. Hopkins would promote Ms. Crescent's books and Ms. Crescent

17   would promote Ms. Hopkins' books.

18         So, for her to say she wasn't aware of the Cocky

19   Series and way that they were presented -- I want to add, your

20   Honor, that she knew about this at least three months or four

21   months ahead of publishing these two books and specifically

22   used the same look of the book, the trademark, specifically

23   used the trademark, in order to entice readers who would have

24   thought that these were Hopkins books.  That's bad faith.  You

25   can't define in it a better way.

1           MS. LACKMAN:  Your Honor, there is a lot that I need

2     to comment on there.  It is completely wrong.  Exhibit M shows

3     there is a book with a single title, which again is not

4     protectable under trademark law.

5           THE COURT:  Which book?

6           MS. LACKMAN:  It shows "Cocky Senators Daughter

7     Brothers Atlanta."  That is the link.  It doesn't say the

8     "Cocky Series" at all.

9           THE COURT:  This is not part of the Cocky Series?

10          MS. LACKMAN:  Right before she started using the term

11    "Cocky Series."  She started using the term "Cocky Series" I

12    don't know when.  Well after this, late 2017.

13          THE COURT:  Mr. Cardillo?

14          MR. CARDILLO:  Your Honor, as the application for

15    trademark, as my client's affidavit states, she was using

16    "Cocky" in the title in this manner since 2016.

17          THE COURT:  That doesn't prove that the defendant had

18    notice of it.

19          MR. CARDILLO:  Your Honor, this is is correspondence.

20    In my client's affidavit, I believe, and I have to double-check

21    this, but I know she references this and she talks about her

22    and Ms. Crescent discussing the books and cross-pollinating

23    each other's list.  It would be impossible for her not to know

24    it if she is telling her readers buy this book from Ms. Hopkins

25    and putting it on her page.  It would be just impossible.

1          MS. LACKMAN:  She wouldn't know if someone used a

2     single title -- Mr. Cardillo cannot state that the term "Cocky

3     Series" was used, because it wasn't, and there would be no

4     reason because it is so --

5          THE COURT:  It seems to me your client knew that there

6     had been use of "Cocky" by the plaintiff.

7          MS. LACKMAN:  There has been the use of that term in a

8     descriptive sense in a title, a single title of a book and in a

9     series, by dozens of writers.

10          THE COURT:  I am going to find that the issue of

11     defendant's good faith cannot be resolved on the preliminary

12     injunction.

13          Seventh is the quality of defendant's product as

14     compared to plaintiff's.  They are pretty much the same, aren't

15     they?

16          MR. CARDILLO:  Your Honor, I would say that my client

17     has 600,000 books sold as of today's date or approximately

18     600,000.

19          THE COURT:  That doesn't prove quality.

20          Do you have anything to say, Ms. Lackman?

21          MS. LACKMAN:  Yes.  I think this is a neutral factor.

22     My client has sold 300,000 copies of her books.

23          THE COURT:  I can't resolve that issue on preliminary

24     injunction.

25          Eight is the sophistication of the purchasers.  It

1    seems to me the readers here are very well acquainted with

2    these kinds of romance books and are very careful about who

3    wrote them.  I suggest to you that we have sophisticated

4    purchasers here.

5        MR. CARDILLO:  Your Honor, may I take a step back with

6    likelihood of confusion?  In a series of books you don't have

7    to prove confusion.  You just have to show that there will be a

8    liked.

9        THE COURT:  You never have to prove actual confusion,

10   just likelihood of confusion.  If you can prove actual

11   confusion, that is extraordinary proof.  I don't think you

12   have.

13       All these eight factors have to do with the judge's

14   finding of likelihood of confusion.  I am going through them

15   one by one.  I'm making a point with regard to the last of the

16   eight factors, the sophistication of the purchasers, that we

17   have sophisticated purchasers.

18       MR. CARDILLO:  Your Honor, if we can't use Exhibit P

19   to show that there was actual confusion with Ms. Crescent's

20   books, I would point out to the Court that Exhibit P at least

21   shows that even though the readers are intelligent, there is

22   confusion within the marketplace based on the way that these

23   books are --

24       THE COURT:  I'm not able to find that.  So I can't

25   find anything on that factor as well.  It seems to me that the

1   readers here are very specific to the genre of books which I

2   would call cheap romance novels and so know what is going on

3   and are not fooled, particularly the way the titles are used.

4           To sum up, the most important factor here as we have

5   gone through the eight is the strength of the plaintiffs' mark.

6   It seems to me at this point of the record and given the way

7   that these titles look to be more adjectives than indications

8   of source, that we have a weak mark.  It is not clear that

9   defendants use the word "Cocky" in a way that makes it an

10  indication of source.  It is more a description of the nature

11  of the contents: Her Cocky Firefighters, Her Cocky Doctors.

12          I hold that defendant is not using the word "Cocky" in

13  a mark.  Although there could be a likelihood of confusion,

14  other factors being equal, that there is some kind of an

15  infringement, at this point I don't think a similarity.

16          Third is the competitive proximity of their products.

17  They are clearly competitive proximate.

18          The fourth is a likelihood that plaintiff will bridge

19  the gap and offer a product like defendants.  That is not

20  really a factor because both are in the market already.

21          Fifth is actual confusion.  I didn't find any.

22          Defendant's good faith, I think it is a mixed factor.

23          Seven, the quality of the defendants' product as

24  compared to plaintiff's, they seem to be equal.

25          Sophistication, at least at this point on the record,

1    the sophistication of the purchasers, I think sophistication is

2    high, and that is another factor against issuing a TRO or a

3    preliminary injunction.

4           Now let's talk about irreparable harm.  Plaintiff will

5    suffer irreparable harm if, assuming the trademark is valid,

6    others will occupy the field.  Although sales data can be

7    obtained and damages can be proved, it is also a damage to good

8    will involved in the trademark that can't be proved.  So there

9    clearly is irreparable harm that would be suffered by the

10   plaintiff in the absence of restraint.

11          However, it seems to me that defendant, who is on the

12   market with her romance novels, if restrained, would also

13   suffer damage and it would be irreparable.  If a book is taken

14   off the market, it can't be sold.  Books of this nature have to

15   do with timeliness as well.  So I can't say that there is any

16   balance here.  If there is, it is likely to tip in defendants'

17   favor because a good portion of injury by the plaintiff would

18   be compensable in damages and captured profits.  So that factor

19   is in favor of defendant.

20          Whether an injunction is in the public interest, given

21   the way these trademarks are used, I don't think there is much

22   of a public interest in them.

23          Here plaintiff can't demonstrate that its trademark

24   merits protection, nor in my opinion that defendant's use of a

25   similar mark is likely to cause consumer confusion.  Those are

1  the eight factors that we just talked about.  Accordingly, the

2  motion for a TRO and for a preliminary injunction is denied.

3          That doesn't mean the case is over.  It means that we

4  go into the next stage of discovery.  I don't know if you were

5  prepared for that, Mr. Cardillo.

6          MR. CARDILLO:  I am, your Honor.  Over the weekend, if

7  Ms. Lackman is available, I will coordinate with her, either

8  that or on Monday in terms of service of the complaint and with

9  Ms. Crescent's --

10          THE COURT:  I think they are going to accept service.

11          MR. CARDILLO:  Both sides?  Okay.  We will serve the

12  complaint on the two law firms, and then we can move forward

13  with a discovery schedule.

14          MR. BOCZKO:  Your Honor, just an opportunity to confer

15  with my client whether to accept service or not.

16          THE COURT:  What schedule do you have in mind?

17          MR. CARDILLO:  I haven't thought about it yet, your

18  Honor.  But I would like to proceed as fast as possible.

19  Without the preliminary injunction, I understand the Court's

20  reasoning, my client's reputation if books are being put out by

21  more than one author --

22          THE COURT:  I think you are entitled to accelerated

23  discovery.

24          MR. CARDILLO:  Thank you, your Honor.

25          THE COURT:  Would three months be adequate?

 1            MS. LACKMAN:  Your Honor, if we accept service under

 2    the rule, we are entitled to 90 days to respond, and we do

 3    intend to move to dismiss.

 4            THE COURT:  I can shorten the time.

 5            MS. LACKMAN:  Even so, we would like permission to

 6    move to dismiss for lack of personal jurisdiction as well as

 7    other grounds, including under the Rogers v. Grimaldi test.

 8            THE COURT:  You can make any motion you want, but that

 9    is not going to slow discovery.

10            MS. LACKMAN:  Thank you, your Honor.

11            THE COURT:  How about three months?

12            MR. CARDILLO:  That's fine with me, your Honor.

13            THE COURT:  To complete all discovery.  Ms. Lackman?

14            MS. LACKMAN:  This is for fact discovery?  Or expert

15    discovery?  We believe that expert may be needed.

16            THE COURT:  I think fact discovery.  Then I'll have a

17    status conference and we'll discuss it.

18            MS. LACKMAN:  If we are still in the case, we can do

19    fact discovery in three months.

20            THE COURT:  Okay.  I'll give you a date.  September 7,

21    11 o'clock.  I was planning not to have a conference on the

22    record, but I'd rather have an informal discussion.  That being

23    the case, unless there is objection, we'll do it at 10 o'clock.

24            MR. CARDILLO:  What was the date, your Honor?

25            THE COURT:  September 7th.

1          MR. CARDILLO:  At 10 o'clock?

2          THE COURT:  Yes.  I am going to change it to September

3   7th.  We'll have September 7th as the date for completion of

4   all fact discovery.  The status conference will be held

5   September 14th at 10 o'clock.

6          MR. CARDILLO:  Thank you, your Honor.

7          MR. BOCZKO:  Thank you, your Honor.

8          MS. LACKMAN:  Your Honor, I have one scheduling

9   question.  You indicated that the time to respond will be

10  shorter than under rule 4.

11         THE COURT:  How much time do you really need?

12         MS. LACKMAN:  To make a motion to dismiss, 30 days

13  probably.  I have a case going to trial pretty soon.

14         THE COURT:  You are not going to answer?

15         MS. LACKMAN:  We intend to move to dismiss, your

16  Honor.

17         MR. BOCZKO:  We do as well, your Honor.

18         THE COURT:  Motion to dismiss will be due 20 days from

19  today, three weeks from today.  June 22.  When the motion is

20  filed, send along with it a schedule of dates for opposing the

21  motion and for reply.  The reply should be a week after the

22  opposition.  I suggest two weeks time for opposition given the

23  accelerated scheduling.  Three weeks, then two weeks, and then

24  one week.

25         Anything else?

1            MR. CARDILLO:  That's it, your Honor.  Thank you.

2            THE COURT:  Defendants, anything else?

3            MS. LACKMAN:  No, your Honor.  Thank you.

4            THE COURT:  Thank you all.  I'm returning the four

5    exhibits to the plaintiff to retain.  Counsel keep the

6    exhibits.  And the book cover I'm giving back to Mr. Boczko

7    with instructions to make a copy of the photograph -- of the

8    cover, and that will be Exhibit A.  The other papers that you

9    gave up I'm returning unmarked.  Thank you all.

10           (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25